# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**APPLE GLEN INVESTORS, L.P., an Indiana**
**Limited Partnership,**

      **Plaintiff,**

**v.**                                **CASE NO.: 8:14-cv-1527-T-33EAJ**

**EXPRESS SCRIPTS, INC., f/k/a Medco**
**Health Solutions, Inc., f/k/a Merck-Medco**
**Managed Care, LLC,**

      **Defendant.**

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter comes before the Court pursuant to a non-jury trial commencing on September 8, 2015, and concluding on September 14, 2015. Plaintiff Apple Glen Investors, L.P. seeks an award of $6,806,412.23 against Defendant Express Scripts, Inc. for breach of a bonded lease. After due consideration, and for the reasons stated below, the Court determines that ESI breached the lease and awards damages in the amount of **$4,654,688.65**.

## I.      FINDINGS OF FACT

### A.    Parties and Procedural History

This diversity case is before the Court by Apple Glen against ESI for breach of a lease dated December 6, 1999, for commercial property located at 8800 Hidden River Parkway, Tampa, Florida, for ESI's failure to return to Apple Glen the leased premises pursuant to the lease requirements.

Both parties are successors in interest to the original parties to the lease. (PX-12). ESI took an assignment of the lease in November of 2001. (Id.). The initial lease term ended on March 31,

2010. (PX-4). ESI and Apple Glen litigated a separate dispute primarily as to whether ESI was a hold-over tenant from 2010, to 2014. (DX-115; Doc. # 78 at 88-89). The lease was never renewed. (Doc. # 78 at 60-61).  ESI vacated the leased premises on March 31, 2014.

Apple Glen commenced this action by filing a state court Complaint on May 27, 2014, alleging that ESI breached the lease by failing to put, keep, maintain, repair, replace, and otherwise return the leased premises to Apple Glen in the first class condition required under paragraphs 12(a) and 12(d) the lease. (Doc. # 2 at ¶ 9). On June 25, 2014, ESI removed the case to this Court based on diversity jurisdiction. (Doc. # 1).  The original Complaint lacked sufficient jurisdictional allegations and the Court accordingly ordered further briefing on the requirements of complete diversity of citizenship. (Doc. # 5).  On July 16, 2014, Defendant filed a Supplement to its Notice of Removal containing sufficient jurisdictional allegations. (Doc. # 9).

On June 15, 2015, the Court denied without prejudice ESI's Motion to Exclude Expert Testimony of Gary Keene and ESI's Motion to Exclude Expert Testimony of Brad Johnson. (Doc. # 54).  ESI did not renew these motions at trial.  On June 27, 2015, the Court denied ESI's Motion for Summary Judgment. (Doc. # 55).  The Court held a non-jury trial commencing on September 8, 2015, and concluding on September 14, 2015.  At the close of Apple Glen's case, ESI moved for partial judgment on the pleading pursuant to Rule 52(c) and renewed the motion at the conclusion of trial. The Court denied ESI's motion. At the conclusion of trial, the Court denied ESI's Motion for the Court to view the leased premises.  (Doc. # 70).  The issues now before the Court are whether ESI breached the lease as to the condition of the premises and whether ESI's affirmative defenses otherwise preclude Apple Glen's claim.

The following witnesses testified at trial:

a.   Hilda Reyes, ESI facilities manager.

2

b. Duane Bobeck, the principal of Apple Glen, which purchased the building facilities and real property that are the subject of the lease;

c. Andrew Dubuque, President of Bobeck Real Estate and Bobeck's son-in-law;

d. Marcos Ibarguen, an architect at CMK Design Studio who was hired by Apple Glen to inspect the premises and to provide a conditions report;

e. Omar Cruz, the facilities manager for Salomon Brothers and SBC Telecom when they occupied the premises and for Apple Glen after ESI vacated the premises;

f. Brad Johnson, a real estate appraiser hired by Apple Glen to opine on the difference between a triple net lease and absolute net lease.  He also performed an appraisal of the premises for Apple Glen in March of 2009, prior to his retention as Apple Glen's expert;

g. Gary Keene, a building contractor hired by Apple Glen to testify regarding the condition of the premises;

h. Sharon Bragg, Vice President of Jones Lange and LaSalle, a commercial leasing broker hired by Apple Glen to market the premises after ESI vacated;

i. Christopher Hart, a HVAC technician who serviced the HVAC system on a weekly basis during ESI's tenancy pursuant to a maintenance contract with ABM and who serviced the HVAC system for Apple Glen after ESI vacated;

j. Larry Fairbrother, a mechanical engineer and ESI expert who specializes in air-conditioning, piping, and plumbing;

k. Tracy Edmonds, an engineer and ESI expert who specializes in elevator systems;

l. William Icely, a general contractor and ESI expert with a master's degree in building construction;

  m. Justin Hofford, a commercial building appraiser and ESI expert; and

  n. Steven Waltz, a food services consultant and ESI expert who was unavailable for trial and testified by deposition.

**B.** **The Leased Premises**

  The leased premises include a 139,000 square foot, three-story commercial office building in north Hillsborough County situated on approximately twenty acres, together with improvements and equipment. (PX-4 at ¶ 2). The leased premises includes the land, improvements, and equipment. (Id.). "Improvements" are "the building and related improvements and any other structures and other improvements now existing or hereafter constructed or reconstructed on the Land." (Id.). Any improvements become the property of Apple Glen. (Id. at ¶ 13(c)). The leased premises are unique because they were developed as a "Mission Critical Facility," which means they were designed and constructed with extraordinary levels of redundancy and reliability of critical systems, particularly, with atypical levels of redundancy in the power service, water service, emergency power, HVAC, and communications necessary to keep the facility fully operational at all times. The leased premises were constructed with greater infrastructure and at a higher cost than typical "Class A" office buildings. (Doc. # 79 at 17).

  Apple Glen's experts, Keene and Johnson, both opined that the leased premises were a mission critical facility. (Doc. # 79 at 21-27, 77-78). ESI's expert, Fairbrother, opined that the leased premises were the "single-most extreme example" of a mission critical facility that he had seen since 1958. (Doc. # 80 at 261). ESI's expert, Hofford, a property appraiser, could not identify any other buildings within the Tampa Bay area with mission critical data functionality and redundancy like the leased premises. (Doc. # 81 at 46-47).

**C.** **The Lease**

### 1.    <u>Tenant's Obligations</u>

Like the leased premises, the lease at issue is also extraordinary because of the high maintenance, repair, and replacement standards it imposes on the tenant, ESI.  Lease paragraph 12(a), "Maintenance and Repair," states:

> Tenant shall at all times, at Tenant's sole cost and expense, **put, keep, and maintain** the Leased Premises (including, without limitation, the parking areas, roof, footings, foundations, interior and exterior walls and structural components of the Leased Premises) and the Equipment **in a first class condition and order of repair, except for ordinary wear and tear,** and shall promptly make all **repairs and replacements** of every kind and nature, whether foreseen or unforeseen, which may be required to be made upon or in connection with the Leased Premises in order to keep and maintain the Leased Premises in the order and condition required by this Paragraph 12(a). . . . Tenant shall, in all events make all repairs for which it is responsible hereunder promptly, and all repairs shall be in good, proper and workmanlike manner.

(PX-4, ¶ 12(a)) (emphasis added).  The Lease further specifies at paragraph 12(d):

> Tenant shall from time to time replace with other operational equipment or parts (the "Replacement Equipment") any of the equipment (the "Replaced Equipment") which shall have become **worn out or unusable for the purpose for which it is intended, or been lost, stolen, damaged or destroyed** as provided in Paragraph 15.

(PX-4 at ¶ 12(d)) (emphasis added).

The lease is an absolute net and bondable lease and puts the entire burden of maintaining and repairing the property and equipment on the tenant, ESI.  (Doc. # 79 at 16-17, 20-21; PX-4). The lease specifically states that the rent shall be "absolute net" to the landlord and other provisions of the lease, such as paragraphs 5, 12, 15, and 16, reinforce that the landlord has no obligations, the tenant is responsible for all of the operating expenses and capital expenditures, and the tenant is not permitted to terminate the lease except under rare circumstances relating to condemnation. (PX-4; Doc. # 79 at 20-21).

To a landlord, the lease is like an investment bond which requires no management or oversight, where the landlord can expect to collect rent throughout the term and receive the

property back in the condition as specified in the lease. (Doc. # 79 at 17-21; PX-131; Doc. # 78 at 33, 52).  ESI itself described the lease as a "bonded" lease that required no services from the landlord under which the tenant is "responsible for all maintenance and repairs." (PX-131). Notably, the lease goes so far as state that even if the building is completely destroyed, the tenant is required to pay full rent and restore the property. (Id.).

### 2. **Landlord Has No Obligations**

In comparison, Lease paragraph 12(a) imposes no duties or responsibilities concerning the Leased Premises on Apple Glen, as it provides:

> Landlord shall not be required to make any repair, whether foreseen or unforeseen, or to maintain any of the Leased Premises or Adjoining Property in any way, and Tenant hereby expressly waives the right to make repairs at the expense of the Landlord, which right may be provided for in any Law now or hereafter in effect.

Apple Glen has no duty to inspect the leased premises as lease paragraph 28 provides:

> Landlord . . . shall have the right upon reasonable notice to enter the Leased Premises . . . for the purpose of inspecting the same or for the purpose of doing any work under Paragraph 12(c), and may take all such action thereon as may be necessary or appropriate for any such purpose (**but nothing contained in this Lease or otherwise shall create or imply any duty upon the part of Landlord to make any such inspection or do any such work**) . . . .

(PX-4 at ¶ 28) (emphasis added).   Similarly, Apple Glen has no obligation to cure any default of ESI, as lease paragraph 12(c) states:

> If Tenant shall be in default under any of this Paragraph 12, Landlord may (**but without any obligation to do so**) after ten (10) business days written notice given to Tenant and failure of Tenant to cure during said period . . . do whatever is necessary to cure such default as may be appropriate under the circumstances for the account of and at the expense of Tenant. . . .

(PX-4 at ¶ 12(c)) (emphasis added).

### 3. **Landlord's Preserved Rights and Remedies**

The lease also contains a non-waiver or anti-waiver provision, which states:

6

> No right or remedy conferred upon or reserved to Landlord in this Lease is intended to be exclusive of any other right or remedy; and each and every right and remedy shall be cumulative and in addition to any other right or remedy contained in this Lease. . . . **No delay or failure by Landlord to enforce its rights under this Lease shall be construed as a waiver, modification or relinquishment thereof.**

(PX-4 at ¶ 21(a)) (emphasis added). Further, paragraph 20(b)(v) provides that "Landlord may exercise any other right or remedy now or hereafter existing by law or in equity." (PX-4 at ¶ 20(b)(v)). Paragraph 21(a) also provides that "No right or remedy conferred upon or reserved to Landlord in this Lease is intended to be exclusive of any other right or remedy; and each and every right and remedy shall be cumulative and in addition to any other right or remedy contained in this Lease." (PX-4 at ¶ 21(a)). Apple Glen has never agreed in writing to modify, amend or waive any of Apple Glen's rights under paragraph 21(a). (Doc. # 78 at 41).

The lease provides that its terms may not be modified or waived unless there is "an agreement in writing signed by the party against whom enforcement of any such modification…or waiver is sought." (PX-4 at ¶ 34(d)). ESI does not allege, and offered no evidence of, any lease modification.

## D.    Condition of Leased Premises when ESI Moved In

In 2000, shortly before ESI assumed the lease, Apple Glen invested $2.3 million to update the leased premises to a state of the art facility, to ensure that the leased premises were in a first class condition. (Doc. # 78 at 34, 37-40). At the time ESI took over the tenancy of the leased premises, it was in a first class condition, according to Bobeck. (Id. at 37). Cruz testified that the leased premises then included a fully stocked kitchen (Id. at 254), a fully operational automated air conditioning control system (Id. at 254-255), a security and monitoring system (Id. at 255), and a full-battery-equipped Uninterruptable Power Supply ("UPS") system. (Id. at 254-255).

A month after the assignment to ESI, ESI described the premises as a "Class A-plus" office

building. (PX-131; Doc. # 78 at 51).  In 2005, ESI again described the premises as "Class A-plus."

(PX-14).

**E.      ESI's Facilities Manager did not Know about, and Failed to Comply with, ESI's Obligations under the Lease**

Reyes worked as the facility manager at the leased premises for twelve years - from 2002

to 2014 - and was primarily responsible for maintenance and capital expenditures.  (Doc. # 77 at

52-53; Doc. # 78 at 25).  Reyes has no formal education in real estate or in property management

(Doc. # 77 at 52), so she relied on vendors to make recommendations for repairs and replacements.

(Id. at 58).  Reyes admitted that neither she nor any of ESI's vendors ever saw the lease or knew

of its requirements while working at the leased premises. (Id. at 57, 63; Doc. # 78 at 26).   ESI's

corporate officers or employees never advised Reyes of the standard to which the lease required

ESI to maintain the leased premises. (Doc. # 77 at 57).

Conversely, Reyes relied on ESI's company-wide protocols implemented for use at more

than a hundred properties of different types across the organization. (Id. at 58-59).  Although the

leased premises were "arguably Medco's nicest call center property," (PX-27 at 4) in accordance

with those company-wide protocols, Reyes only replaced equipment if it "failed beyond repair."

(Doc. # 77 at 60).  ESI did not offer any tangible evidence, such as manuals or handbooks, of its

company-wide protocols or any evidence to support that its company-wide protocols are consistent

with the lease requirements.

**F.      ESI's Corporate Officers Knew of, and Planned to Fulfill, the Lease Obligations**

**1.      ESI Planned for and Anticipated the Failure of Equipment**

Jeff Tyler, ESI's director of corporate real estate, managed the leased premises from ESI's

New Jersey corporate offices, along with over a hundred other major ESI properties. (Doc. # 78 at

50-51). ESI anticipated spending millions of dollars on the leased premises on "capital expenditures" to repair and replace building components and equipment as required by the lease; yet in the thirteen years it occupied the leased premises (2001-2014), it never actually spent the vast majority of these monies. At one point, ESI had stated that Apple Glen and any lender could rely on it as the tenant responsive for complying with the lease obligations as it is a Fortune 100 company with net revenues of more than $44 billion. (PX-16).

Beginning in October of 2008, ESI strategized the pros, cons, and costs of lease renewal and staying at the leased premises beyond the end of its lease term in 2010, in comparison to vacating the leased premises and leasing another property. ESI considered that the maintenance costs were increasing as the building neared twenty years of age. (PX-18; PX-101; Doc. # 77 at 90-96). ESI's charts and spreadsheets identify the useful life of building systems to plan for future repairs and replacements. These internal documents show that the useful life of some of the equipment would expire before 2014, including the UPS system, chillers, and air handlers. (PX-99; Doc. # 77 at 82-84).

ESI created capital budget spreadsheets titled "10 year capital plan" identifying approximately $7 million of needed capital expenditures and anticipating the failure of the critical systems and capital items, as well as repair and replacement costs associated therewith, based on the expiration of the useful life of the equipment before 2014, including the UPS system, HVAC system, and elevators. (PX-101). For 2010, through 2014, the capital plan shows a total of $6,626,416 for capital repairs and replacements that is broken down by year, by equipment type, and by dollar the various costs associated with replacing equipment and other items. For example, ESI planned to spend $1.5 million for UPS replacement in 2009 and 2010, and $600,000 to replace six Liebert units in 2013. (PX-18; PX-101; Doc. # 77 at 90-97).

A "10 year capital plan" spreadsheet created by Tyler quotes the maintenance and repair provisions of lease paragraphs 12(a) and 12(d) and states that they "shall apply regarding the engineering, pricing, and construction of capital building repairs and replacements." (PX-95; Doc. # 77 at 96-97).

### 2.     ESI Requested Funds to Perform the Work

In June of 2009, only a few weeks before the lease renewal date, ESI submitted a Project Spending Request requesting $6.8 million dollars from its corporate real estate department to perform the needed work with a start date of April 2010, but the Request was never fully approved, so the work was never funded or performed.  (PX-27 at 1, 9, 11; Doc. # 77 at 98-99, 103-105).  In the Request, ESI referred to the building as a "Class A Office Building," and not Class A-plus. (PX-27 at 4).

The Request included a ten-year capital plan spreadsheet dated June 11, 2009, which was updated by Reyes. (PX-27 at 9; Doc. # 77 at 100).  The plan showed a total of $6,710,800 in capital expenditures planned through the year 2014 (the year ESI vacated), including $750,000 for UPS, millions of dollars for HVAC, $800,000 for roof top units, $1,850,000 for chiller replacement, $600,000 for Liebert units, and $57,000 for caulking, cleaning, and exterior sealants. (PX-27 at 9; Doc. # 77 at 100-101).

ESI's financial department was tasked with approving Project Spending Requests submitted and prioritized the requests according to the needs across the company. (Doc. # 77 at 102-103).  The Request submitted required the approval by signature of approximately fifteen to twenty people from different departments to approve the funds. While the Request was approved by several people, including, the Corporate Real Estate Director (Tyler), the Chief Operating Officer, the Corporate Business Planner, the Senior Vice President of the Corporate Business

Division, and the Chief Infrastructure Officer, it was never approved by the Chief Financial Officer, Richard Rubino, or the Chief Executive Officer, David Snow. (PX-27 at 11, 15; Doc. # 77 at 103-105).  ESI did not elicit the testimony of any of its corporate officers, including Tyler, Rubino, and Snow, at trial.

The $6.6 million of capital expenditures ESI requested and projected spending (but did not spend) match line-item by line-item Apple Glen's damages claims for these same years. (PX-46; Doc. #80 at 80-85; PX-126).  However, Apple Glen actually formulated and calculated its damages claims before ever seeing these documents. After Apple Glen's expert, Keene, produced his Rule 26 expert report and was deposed twice, ESI produced 6,500 pages of internal documents days before the discovery deadline that included the 10 year capital plan spreadsheet, useful life charts, and the Project Spending Request.  Each of these documents directly supports Keene's opinions and conclusions. (Doc. # 79 at 94-96; Doc. # 80 at 80-85).  ESI's useful life studies actually identify less years of useful life for the alleged deficiencies at issue than the useful life studies relied on by Apple Glen (Doc. # 80 at 6-7), and ESI projected higher costs for the majority of the items. (Id. at 81, 84).

ESI argues that the capital budgets were merely exercises to plan for the future and that sometimes the money is not spent. (Doc. # 78 at 26-27).  However, even if the capital budgets were "merely" for planning purposes as ESI asserts, ESI still planned to spend millions of dollars on capital expenditures to replace building equipment and components based on the useful life of the equipment and the anticipated failure of equipment during the lease renewal period. (PX-18, 95, 99, 101; Doc. # 77 at 83-84, 90-97).  Further, ESI actually requested the funds on the capital budgets through the Project Spending Request, which was based on and included a capital budget spreadsheet. (PX-27 at 9; Doc. # 77 at 100).  ESI offered no evidence to contest that it formally

submitted (and obtained partial approval of) the Project Spending Request that requested the authority and funding to actually spend the millions of dollars on capital expenditures to replace the same building equipment at issue in this case based on the useful life of that equipment and its anticipated failure during the lease renewal period. (PX-27 at 11, 15; Doc. # 77 at 98, 102).

On November 29, 2011, Tyler sent an email that establishes ESI's full understanding of its obligations under the lease as follows:

> Attached is a summary of what lease says about repair and maintenance. Basically everything is Medco's responsibility and at Medco's cost. Landlord will not provide any contribution. . . . If we must do any replacements such as a new UPS battery system that will require changes to building electrical or other systems, we should notify landlord that we are doing so. Landlord will take issue with anything we propose to do unless we prove conclusively that the work we are doing will keep the building in first-class condition.

(PX-49).

### 3.   ESI Permitted the Leased Premises to Deteriorate

As of June 2009, ESI removed all future building maintenance and repair capital from the Project Spending Request and planned to submit those requests separately for approval based on "necessity" over the five year term of the lease renewal. (PX-28). In July of 2009, lease renewal negotiations were actively ongoing between Apple Glen and Medco. (Doc. # 78 at 59).  Medco provided Apple Glen with a Prevailing Market Rent Report dated July 9, 2009, describing the property as a "Class B Office Building." (PX-29).  On July 15, 2009, Apple Glen sent a letter to ESI reminding ESI of its contractual obligation to maintain the premises in a "first class condition," based on ESI's broker's report that the building was "aged" and the equipment was "obsolete." (JX-4).  ESI did not respond to the July 15, 2009, letter.

While ESI remained in the premises from 2010, to 2014, ESI's internal documents reveal that long before this lawsuit, ESI affirmatively decided to stop fulfilling its obligations under the lease by putting all "major capital expenditures on hold" and planned to "only do necessary repairs

until lease expires." (PX-28; PX-45; Doc. # 77 at 109-111; Doc. # 80 at 86-87). This strategy was never shared with Reyes. (Doc. # 77 at 111-114). However, Reyes continued to perform repairs and replacements consistent with this strategy by only replacing equipment if it completely failed or met the end of its life. (Id.).

Notwithstanding the "first class" requirement, ESI allowed the leased premises to deteriorate to something far short of "first class."  Specifically, in February of 2011, ESI anticipated that upon lease renewal "[l]arge capital repairs to the building will be required immediately." (PX-45 at 14; Doc. # 80 at 87).  In March of 2012, while analyzing the cost for ESI to relocate, ESI concluded that staying at the leased premises would require replacement of the "obsolete HVAC and electrical systems." (PX-50; Doc. # 80 at 87-88).  ESI's maintenance records reflect that it significantly reduced or eliminated regular, required maintenance as of 2012; thereby allowing the leased premises to deteriorate. (Doc. # 79 at 69-70). Further, in May of 2013, ESI described the property as "an aging building needing major work." (PX-51; Doc. # 80 at 88-89).

## G.     CMK Report

In November of 2013, Dubuque, President of Apple Glen and son-in-law to Apple Glen's founder (Doc. # 78 at 65), learned of the possibility that ESI might vacate the leased premises on short notice. (Id. at 102).  Thereafter, Apple Glen retained architect Ibarguen of CMK Design Studio, LLC to inspect and prepare a conditions report regarding the leased premises. (JX-8). When Ibarguen conducted his inspection of the property, ESI controlled access to the leased premises and limited the amount of time Ibarguen was permitted to spend at the leased premises. (Id. at 106-107).   Nevertheless, Ibarguen was able to visually inspect the leased premises for two hours and prepared a report of his findings (the "CMK Report").

The CMK Report identified several aspects of the property that Ibarguen determined were not being appropriately maintained. (JX-8). The CMK Report graded the Leased Premises on a 4-score scale, where score 1 was given to property "currently in first class condition" and score 4 given to property "currently in unacceptable condition, requiring extensive repair and/or full replacement to attain first class condition." (Id.). Ibarguen identified a number of items to be in less than first class condition, including the asphalt pavement, sealants, metal railings, landscaping, hot water heaters, the HVAC System, and UPS. (Id.).

On January 13, 2014, months before ESI vacated the Leased Premises, Apple Glen sent ESI a letter and a copy of the CMK report requesting that ESI contact Apple Glen to discuss problems identified in the CMK report. (JX-9). Once again, ESI did not respond to the letter. (Doc. # 78 at 167-168).

## H.   ESI Vacates the Leased Premises

With less than a month's notice, ESI vacated the leased premises on March 31, 2014. (Id. at 103; Doc. # 77 at 63, 66-67). In fact, ESI was uncertain as to exactly which date it would vacate up until a few days before it actually vacated. (Doc. # 78 at 103). Although Reyes had been the facility manager for twelve years, she learned that ESI was vacating the building only about a month before ESI actually vacated. (Doc. # 77 at 66-67). And, after the announcement, she was no longer in charge. (Id.). To her knowledge, ESI performed no additional work to fix the building before it vacated. (Id.).

## I.   Apple Glen Takes Possession of the Leased Premises

In anticipation of ESI's departure, Cruz, Apple Glen's facilities manager, returned to work at the leased premises. (Id. at 257-258). After he received the building keys from ESI on March 31, 2014, Cruz found the "whole building was stripped out" with a "completely empty" kitchen,

and "not even a chair" was left or any other light bulbs or other janitorial supplies. (Id.).  A rack of batteries for the UPS was missing (Id.), as was the "main brain" of the security and surveillance system (Id. at 258) and the HVAC building management system controller (Id. at 260).   The kitchen was dirty and infested with roaches. (Id. at 259).

Shortly after Apple Glen took possession of the premises, Apple Glen sent ESI a videotape as well as a detailed list of issues "it could readily identify as being in breach of the Lease terms." (PX-61).  The videotape documented substantial alligator cracking, heaving, and surface erosion, haphazard landscaping, stained ceiling tiles, water intrusion, leaking skylights with ponding water and encapsulated moisture, two missing UPS battery strings, "danger, do not touch" and "power down" signs on the UPS systems, a twenty year old generator switch, original air conditioning equipment, and a missing automated computer and software system to control the air conditioning. (Doc. # 78 at 111-127; PX-59).  ESI did not respond. (Doc. # 78 at 128).  Once again, ESI did not communicate with Apple Glen about the physical defects identified in the leased premises. (Id. at 129).

**J.**     **Expert Witnesses' Opinions and Methodologies**

**1.**     **Apple Glen's Expert Gary Keene**

Apple Glen's expert, Keene, a licensed general contractor, with more than forty years of experience, opined that twenty-six physical deficiencies in contravention of the lease requirements existed at the leased premises at the time ESI vacated.  (PX-126).  All of the physical deficiencies that he identified were no longer first class and exceeded ordinary wear and tear, and/or were worn out or unusable for the purposes intended. (Doc. # 79 at 82).

Keene spent over twenty hours inspecting the leased premises alone, expending over thirty hours more to conduct his fact-finding and analysis. (Id. at 72).   In formulating his opinions, Keene

relied on industry standards and published authorities, including the American Society for Testing and Materials ("ASTM"), RSMeans, and five useful life studies from reliable sources - Fannie Mae, the American Society of Heating, Refrigerating, and Air-Conditioning Engineers ("ASHRAE"), the D.C. Office of Affordable Housing, Princeton University, and Menlo - to obtain a consensus of the expected useful life for the deficient items based on real-life data. (Doc. # 79 at 82-83; Doc. # 80 at 5-7; PX-75 at 41).   No competing methodology based on the ASTM, RSMeans or any other authority was offered by ESI or its experts.

Based on the ASTM standard, Keene testified that a "physical deficiency" is:

> conspicuous defects or significant deferred maintenance of subject property's material systems, components, or equipment as observed during the field observer's walk-through survey.  Included within this definition are material life-safety/building code violations and material systems, components, or equipment that are **approaching, have reached, or have exceeded their typical [expected useful life]** . . . . This definition specifically excludes deficiencies that may be remedied with routine maintenance, miscellaneous minor repairs, normal operating maintenance, etc., and excludes de minimis conditions that generally do not constitute a material physical deficiency of the subject property.

(PX-104 at 4)(emphasis added).  Based on the ASTM standard, "expected useful life" means "the average amount of time in years that an item, component, or system is estimated to function when installed new and assuming routine maintenance is practiced." (Id.).

Based on these definitions, Keene evaluated the expected useful life of the items at the Leased Premises assuming that required normal and reasonable routine maintenance was performed. (Doc. # 79 at 81). Keene explained that the reasonable normal and routine maintenance of an item will not extend the item's expected useful life. (Id.).  Conversely, poor maintenance of an item will reduce the item's expected useful life. (Id.).

Keene testified that useful life studies offer a realistic expectation of when critical building components need to be refurbished or replaced and the ability to plan, budget, and systematically replace equipment and components as they reach their expected useful life, to eliminate the

16

possibility of unexpected disruptions to the building. (Id. at 83). Keene explained that, in his forty-plus years in the construction industry, it is typical to plan for and systematically replace equipment that has reached or exceeded its expected useful life, rather than waiting for it to completely fail beyond repair. Otherwise, there is a high risk of lengthy unexpected disruptions to the business when the equipment fails. (Id. at 85; Doc. # 80 at 56-57).

Keene opined that equipment beyond its expected useful life is a physical deficiency, even assuming routine maintenance is practiced, and could never be considered first class as required by the Lease and is worn out and unusable for the purposes intended because, for example, it cannot perform at the requisite level of functionality and reliability for a commercial office building. (Doc. # 79 at 84; Doc. # 80 at 7-8).

To determine the cost of repairs and replacements, Keene relied on RSMeans, a construction cost data system, to develop his own scope of work and estimates of repair and replacement. (Doc. # 79 at 85-87). Keene then solicited a scope of work and bids from multiple industry professionals and contractors with specialized knowledge for each physical deficiency, a number of whom were already familiar with the building, to compare with his own scope of work and estimates. (PX-108; Doc. # 79 at 87-88; Doc. # 80 at 68-72). Keene then selected the bid from the lowest responsible bidder qualified to perform the work for each physical deficiency and added a five percent contingency cost, liability insurance, contractor's fee, and permitting costs, which is typical in the construction industry. (PX-75; Doc. # 79 at 106-111; Doc. # 80 at 69-70; PX-126). The Court finds that the methodology utilized by Keene to determine costs of repairs and replacements is reliable.

### 2. ESI's Experts

ESI's experts Fairbrother, Icely, Hofford and Waltz (who testified via a videotaped deposition) all opined that aspects of the leased premises were in a Class A condition, which they opined was synonymous with first class, ESI did not exceed ordinary wear and tear, and none of the equipment was worn out or unusable. (Doc. # 80 at 258; Doc. # 81 at 19, 21, 31, 34-48; Stephen Waltz Dep. at 8, August 26, 2015).

In assigning weight to ESI's experts' opinions, the Court considers that the experts provided no methodology or analysis for their opinions and conclusions and relied on no published authorities or material. (Doc. # 80 at 260-264, 268; Doc. # 81 at 19-20)  Fairbrother's opinions are based on his own personal observations and experience and he relied on no authorities other than himself and ASHRAE. (Doc. # 80 at 260-264, 268).  Fairbrother "has pretty good faith in" and "does not disagree" with ASHRAE. (Id. at 261-262).  Hofford conceded that he conducted "no analysis as to whether any equipment in the building had become worn out or unusable." (Doc. # 81 at 47).  Further, Hofford is an appraiser, not a building contractor, and performed only an approximately three-hour general inspection of the building in November of 2014.  (Id. at 34-48; DX-121).

Icely also provided no authorities, visited the premises only one time, for two hours in December of 2014, nine months after ESI vacated and only a few days before ESI's Rule 26 expert report deadline, and spent only eleven hours total evaluating the premises and preparing his report. (Doc. # 81 at 19-20, 21, 31).  However, Icely testified that a number of items required maintenance. His estimated damages for these items were consistent with Keene's estimates. (Id. at 8, 11, 13, 24).

Similarly, Waltz based his opinions solely on his own personal observations made during a three-hour visit to the leased premises. (Waltz Dep. at 8).  Neither ESI nor any of its various

experts offered or cited to any published authorities or industry standards to counter the ASTM, RSMeans, ASHRAE, D.C. Office of Affordable Housing, Princeton University, Fannie Mae, or Menlo authorities offered by Apple Glen or its expert, Keene, except Fairbrother, who mentioned the ASHRAE standards relied on by Keene.

## II.   CONCLUSIONS OF LAW

The Court makes the following conclusions of law.

### A.   Interpretation of the Lease

Apple Glen asserts that ESI has breached the lease by failing to put, keep, maintain, repair, replace, and otherwise return the leased premises and equipment to Apple Glen in "first class condition and order of repair, except for ordinary wear and tear" under paragraph 12(a).  With respect to equipment, Apple Glen claims that ESI also breached paragraph 12(d) of the lease because of its failure to "replace with other operational equipment or parts . . . any of the equipment . . . which shall have become worn out or unusable for the purpose for which it is intended, or been lost, stolen, damaged or destroyed."

The elements of a breach of contract are: "(1) a valid contract; (2) a material breach; and (3) damages." Abbott Labs., Inc. v. Gen. Elec. Capital, 765 So. 2d 737, 740 (Fla. 5th DCA 2000). ESI admits to the existence and validity of the lease with Apple Glen.  ESI agrees that all of the maintenance expenses and repairs were ESI's responsibility. (Doc. # 78 at 19-20).  However, ESI contends that it had no duty to replace equipment that was functioning and operational, had no reports of failing, had not yet been replaced, and had no duty to replace equipment under paragraph 12(a). ESI also argues that it has no obligation to perform after the lease terminated because paragraph 12 does not include a survivability provision. However, during ESI's month-to-month

holdover tenancy, the tenancy continued "upon the same terms and conditions" in the lease, pursuant to lease paragraph 24(b).

Apple Glen asserts that is not seeking damages for ESI's failure to maintain the leased premises after ESI vacated. (Doc. # 78 at 204-205). Rather, Apple Glen is seeking damages for ESI's failure to comply with the lease before ESI vacated the leased premises. (Id.). ESI asserts that it had no duty to replace equipment under paragraph 12(a). However, equipment is subject to replacement under paragraph 12(a), which required ESI "at all times" to "put, keep, and maintain . . . the Equipment in a first class condition" and to "make all repairs and replacements of every kind and nature." (PX-4). Also, the lease's definition of "Leased Premises" includes "Equipment." (Id.). Reyes testified that in her view, worn out and unusable for the purposes intended mean the same thing. (Doc. # 77 at 66). Reyes stated that "worn out means that it's not doing what it's intended to do." (Doc. # 78 at 15-16).

The lease does not define the terms "first class," "worn out," "unusable for the purpose intended," or "ordinary wear and tear." The interpretation of a contract is a question of law for the court, and generally, "words . . . are to be given their plain and ordinary meaning." Schwartz v. Fla. Bd. of Regents, 807 F.2d 901, 905 (11th Cir. 1987). Under Florida law, unless the parties agree that disputed terms should have another meaning, "disputed terms in a contract should be given the meaning used by people in that trade, business, or technical field." Florida Supreme Court, Standard Jury Instructions, Interpretation – Meaning of Disputed Technical or Special Words, 116 So.3d 284, at *316 (§ 416.16) (2013); In re Gulf Coast Orthopedic Center, Inc., 297 B.R. 865, 868 (M.D. Fla. 2003) ("Under Florida law, if a contract is silent as to certain terms, custom and usage of that trade is specifically incorporated therein."); Fred S. Conrad Constr. Co. v. Exch. Bank of St. Augustine, 178 So. 2d 217, 221 (Fla. 1st DCA 1965) ("An established custom

or trade usage respecting a commercial transaction may annex incidents to a written contract, and

a contract involving such a transaction should be interpreted in the light of such custom or usage.");

NCP Lake Power, Inc. v. Fla. Power Corp., 781 So. 2d 531 (Fla. 5th DCA 2001) ("[W]hen the

language of a contract does not deal in express terms with all aspects of the rights and duties of

the parties to the agreement, the language used 'should be interpreted as reasonable persons,

knowledgeable about the business or industry.").

    "Courts routinely examine extrinsic evidence to determine the meaning of contract terms

even while holding that the contract is unambiguous." Snow v. Boston Mut. Life Ins. Co., 590 F.

App'x 832, 834 (11th Cir. 2014) ("The parol evidence rule excludes extrinsic evidence offered to

vary or contradict, rather than to explain and interpret, the terms of an integrated contract."); Se.

Banks Trust Co., N.A. v. Higginbotham Chevrolet-Oldsmobile, Inc., 445 So. 2d 347, 348-39 (Fla.

5th DCA 1984) (evidence showing the meaning of technical terms is not an exception to the parol

evidence rule because it does not vary or contradict the written instrument, but merely places the

fact finder in the position of the parties when the contract was made).

    Courts are not to isolate a single term or group of words and read that part in isolation; the

goal is to arrive at a reasonable interpretation of the text of the entire agreement to accomplish its

stated meaning and purpose. City of Homestead v. Johnson, 760 So. 2d 80, 83 (Fla. 2000) ("[T]he

agreement must be interpreted in light of its stated purpose and that the term[s] must be viewed in

relation to the other terms and provisions contained within the agreement."); see also Brown v.

Travelers Ins. Co., 649 So. 2d 912, 914–15 (Fla. 4th DCA 1995). "We must read the contract to

give meaning to each and every word it contains, and we avoid treating a word as redundant or

mere surplusage if any meaning, reasonable and consistent with other parts, can be given to it."

Equity Lifestyle Props., Inc. v. Fla. Mowing and Landscape Serv., Inc., 556 F.3d 1232, 1242 (11th

Cir. 2009) (internal citations omitted). "Individual terms must not be considered in isolation when interpreting a contract, but rather must be interpreted as a whole and in relation to one another." Siedle v. Nat'l Ass'n of Sec. Dealers, Inc., 248 F. Supp. 2d 1140, 1144 (M.D. Fla. 2002). "To construe the contract, one part of an agreement may be resorted to for the explanation of the meaning of the language of another part." Arriaga v. Fla. Pac. Farms, L.L.C., 305 F.3d 1228, 1247 (11th Cir. 2002) (internal citations omitted).  "The court's role is to determine the intention of the parties from the language of the agreement, the apparent objects to be accomplished, other provisions in the agreement that cast light on the question, and the circumstances prevailing at the time of the agreement." Schwartz v. Fla. Bd. of Regents, 807 F.2d 901, 905 (11th Cir. 1987).

"The parties are bound by the language of [the] contract . . . no matter how disadvantageous that language later proves to be for one party or the other." In re Taylor, Bean & Whitaker Mortg. Corp., No. 3:09-bk-7047-JAF, 2015 WL 728493, at *2 (M.D. Fla. Feb. 19, 2015) (noting that every provision in a contract should be given meaning and effect); eComSystems, Inc. v. Shared Mktg. Servs., Inc., No. 8:10-cv-1531-T-33MAP, 2012 WL 171083, at *4 (M.D. Fla. Jan. 20, 2012) (noting that no contract provisions should be rendered superfluous and contracts should be construed to give effect to the intent of the parties).

In determining whether an item is in a first class condition, the court may consider the language of the lease, the surrounding circumstances, the type, age, and condition of the leased premises and the item at issue, and the reliability, functionality, and serviceability of the item, its useful life, and the availability of replacement parts. See Royal St. Louis, Inc. v. United States, 578 F.2d 1017, 1018 (5th Cir. 1978), in which the court "[t]hrough application of basic contract principles," concluded that a lease requiring the lessee to maintain all furnishings and equipment in a "first class condition" meant that "the lessee is obligated to maintain the personal property in

such a condition that the lessors will suffer no economic loss." Id. at 1018. This case provides an example of the extraordinary nature of the term "first class." The court explained: "'first class' with respect to the construction of the hotel leads us to the conclusion that the parties intended the lessee to be furnished with a new, functional hotel, a structure which at its completion lacked any wear and tear, obsolescence or other economic loss." Id. at 1020.

Under Florida law, where a lease includes an "ordinary wear and tear" exception, that exception does not eliminate the tenant's obligation to make capital replacements and repairs, which wear out during tenancy and cannot be corrected by ordinary maintenance. See Capitol Funds, Inc. v. Arlen Realty, Inc., 755 F.2d 1544, 1549 (11th Cir. 1985) (requiring replacement of roof and parking lot); Rizzo v. Naranja Lakes Condo. Assoc. Numbers One, Two, Three, Four & Five, 498 So. 2d 451, 452 (Fla. 3d DCA 1986) (requiring replacement of capital improvements). Neither of the leases at issue in those cases held the tenant to the extremely high standard of maintaining the property in a "first class" condition. Rather, these cases merely required a "good" and "substantial order" condition. See Capitol Funds, Inc., 755 F.2d at 1545 (requiring "good, safe and substantial order and condition"); Rizzo, 498 So. 2d at 452 (requiring "in good and substantial order and repair").

The Court finds that items at the leased premises (as detailed herein) cannot be in a first class condition, excepting ordinary wear and tear, and are worn out or unusable for the purposes intended under the lease if they are a "physical deficiency," as set forth in the ASTM industry standard and as opined by Apple Glen's expert, Keene.  ESI submitted no competing methodology based on the ASTM or any other authority to determine whether the items were in a condition constituting a breach under the lease.

As defined in the ASTM, a "physical deficiency" includes "significant deferred maintenance" items that are "approaching, have reached, or have exceeded their typical [expected useful life]" and excludes "deficiencies that may be remedied with routine maintenance, miscellaneous minor repairs, normal operating maintenance, etc., and excludes de minimis conditions that generally do not constitute a material physical deficiency of the subject property. (PX-104 at 4). The definition of "expected useful life . . . assum[es] routine maintenance is practiced." (Id.).

The Court finds that the industry standard for a physical deficiency is as set forth in the ASTM, consistent with Keene's expert opinion. The Court further finds that Keene's methodology for identification of physical deficiencies is consistent within the industry as set forth by the ASTM standard. Physical deficiencies, as defined by the ASTM and Keene, are distinguishable from ordinary wear and tear because the definition of physical deficiency contemplates the existence of ordinary wear and tear and excludes it from the definition. Conditions are not due to ordinary wear and tear where there is significant deferred maintenance or in an instance where systems, components, or equipment are approaching, have reached, or have exceeded their typical expected useful life.

Alternatively, even if the Court were not to rely on the industry standard as testified to by Keene, the Court finds that items constituting a "physical deficiency" are not first class because they are not "of the highest quality." Items constituting a "physical deficiency" are "worn out and unusable for the purposes intended" because they are "too old to be used any longer," are "not suitable or fit for use," and are "not convenient and practicable for use," in a commercial office building, much less a mission critical facility. Merriam Webster's Dictionary defines "first class" as "of the highest quality." Merriam-Webster's Collegiate Dictionary, available at

http://www.merriam-webster.com/dictionary/first-class (last visited Nov. 8, 2015).   It defines

"unusable" as not "in good enough condition to be used" and "not suitable or fit for use" and "not

convenient and practicable for use." Merriam-Webster's Collegiate Dictionary, available at

www.merriam-webster.com/dictionary/usable (last visited Nov. 8, 2015). It defines "worn out" as

"too old or damaged from use to be used any longer" and "exhausted or used up by or as if by

wear."    Merriam-Webster's    Collegiate    Dictionary,    available    at    www.merriam-

webster.com/dictionary/wornout (last visited Nov. 8, 2015).

To discern the interpretation that will give effect to the lease as a whole, the Court considers

the leased premises' purpose as a mission critical telecommunications facility requiring the highest

level of functionality and reliability. The lease did not permit ESI to wait for the equipment to

completely fail before it required replacement. Both Apple Glen's expert, Keene, and ESI's own

expert, Fairbrother, agreed that in a mission critical facility, such as this, one should not wait until

items within the facility break to repair or replace them. (Doc. # 80 at 7-8, 270).  ESI's internal

documents further bolster its obligations to replace items and equipment, even if technically

functioning, if it could not perform at the requisite level of functionality and reliability for a

commercial office building and mission critical facility.

Notably, ESI replaced less expensive items and equipment, even if functional, if it was

having problems or was not reliable, but did not replace the more expensive equipment at issue in

this case.   (Doc. # 78 at 22-23).   Reyes conceded at her deposition that equipment that was

technically functioning could be worn out. (Doc. # 77 at 64).  However, at trial she stated that she

made a mistake at her deposition and changed her testimony. (Id. at 64-65).  ESI's own internal

memo from December of 2001, reflects that the lease required ESI to replace the equipment in

dispute; it states that ESI would be responsible for replacing "worn-out, damaged, or destroyed

operational equipment of the building." (PX-131; Doc. # 78 at 52-53). It was Apple Glen's similar understanding that, under the lease, "operational equipment" could become "worn out," even though it was still operational. (Doc. # 78 at 53). The lease language itself contemplates that equipment needed to be replaced (even if still operational) because the lease requires the tenant to "replace with **other** operational equipment or parts . . . any of the equipment . . . which shall have become worn out or unusable for the purpose for which it is intended, or been lost, stolen, damaged or destroyed."

**B.**     **Apple Glen's Claims for Breach of the Lease**

**1.**     **Burden of Proof**

Apple Glen has the burden to prove that ESI failed to relinquish the premises and equipment in a first class condition, and ESI has the burden of showing that such condition was not caused by ESI's failure to properly maintain the premises and equipment, but that such condition was caused by ordinary wear and tear. See Stegeman v. Burger Chef Sys., Inc., 374 So. 2d 1130, 1131 (Fla. 1st DCA 1979) (holding that lessee has burden of proving what portion, if any, of damages and cost of restoration resulted from normal wear and depreciation, not recoverable by the lessor).

Additionally, while Apple Glen has the burden of proving the damages it incurred, ESI has the burden of proving the portion, if any, of damages and cost of restoration resulting from ordinary wear and tear not recoverable by Apple Glen. Id.; see also Cunningham Drug Stores, Inc. v. Pentland, 243 So. 2d 169, 171 (Fla. 4th DCA 1970) (holding that in lessor's action for damages for lessee's failure to deliver premises at end of term in same condition as when received, failing to allow for depreciation and reasonable wear and tear in arriving at final damage figure was not error; lease agreement excepted ordinary wear and decay from lessee's obligation to deliver

premises in as good condition as he received them and lessee failed to offer any evidence establishing reasonable figure for depreciation).

### 2.   **The Parties' Positions**

According to ESI, it spent millions of dollars maintaining the property and any deficient condition constitutes reasonable wear and tear as permitted under the lease. (Doc. # 77 at 123-124). ESI had maintenance contracts with vendors for the following items: generators, HVAC, UPS system and batteries, landscaping, pest control, fountain, construction, water treatment, electrical, plumbing, elevator, fire safety, housekeeping, and food service. (Id.).   In 2010, ESI made a number of upgrades to the property. (DX-90; Doc. # 78 at 21-22).   ESI spent $5.4 million on maintenance in 2012. (Doc. # 77 at 132-133; Doc. # 78 at 7).

Reyes testified that when ESI vacated, the leased premises were in "good working condition" and all of the equipment was "functioning properly" and there was no water intrusion. (Doc. # 77 at 126).   She maintains that the leased premises were in a first class condition. (Id. at 63). ESI asserts that there was never a failure of any major component, including the HVAC and the UPS. (Id. at 125).

ESI also urges the Court to consider that Apple Glen marketed the property as a Class A building with superior systems infrastructure, including redundant power backup, and described the property as a "show stopper" in the marketing material and in communications with prospective tenants. (DX-124; DX-67; DX-18).   However, Apple Glen responds that it intentionally did not market the building as "first class." (Doc. # 78 at 132-133; Doc. # 80 at 221-222). No evidence exists of Apple Glen marketing the leased premises as first class.   The new lease between Apple Glen and its new tenant does not require the tenant to maintain the building in a first class condition. (JX-13).

Apple Glen argues that while ESI may have performed maintenance in accordance with company-wide protocols, it failed to perform the level of maintenance, repairs, and replacements required under the l ease. However, it cannot be determined whether ESI performed maintenance in accordance with company-wide protocols because the protocols were not produced, offered as evidence, or particularly described to the Court.  Apple Glen argues that ESI's maintenance contracts do not establish that ESI performed the required level of maintenance. (Doc. # 80 at 266-267).  ESI's own expert, Fairbrother, agreed that even though ESI had maintenance contracts, this does not mean that the vendors "did a good job." (Id. at 266-267).   ESI did not need to, and preferred not to, incur the costs to maintain and operate the extra redundant systems. (PX-50; Doc. # 77 at 118-120).   In the thirteen years of ESI's tenancy, Reyes made, and ESI's corporate officers approved, only two major replacement requests - for replacement of the roof and the UPS batteries. (Doc. # 77 at 124-125, 127; Doc. # 78 at 21).

Although ESI asserts it spent $5.4 million in maintenance in 2012, ESI's expenditures included its electric bills, which were $77,000 per month. (Doc. # 77 at 132-133; Doc. # 78 at 7). Apple Glen asserts that ESI has not set forth the amount spent for maintenance after 2012. ESI's maintenance records reflect that it significantly reduced or eliminated regular, required maintenance as of 2012; thereby allowing the leased premises to rapidly deteriorate. (Doc. # 79 at 69-70).

Apple Glen's photographs and video taken shortly after ESI vacated the premises reveal that ESI returned the premises with substantial alligator cracking, heaving, and surface erosion, haphazard landscaping, stained ceiling tiles, water intrusion, missing UPS battery strings, "danger, do not touch" and "power down" signs on the UPS systems, original air conditioning equipment,

and a missing automated computer and software system to control the air conditioning. (PX-107; PX-59).

Apple Glen emphasizes that ESI's internal documents reveal that long before this lawsuit, ESI affirmatively decided to stop fulfilling its obligations under the lease by putting all "major capital expenditures on hold" and planned to "only do necessary repairs until lease expires." (PX-28; PX-45; Doc. # 77 at 109-111; Doc. # 80 at 86-87).  Notwithstanding the "first class" requirement, ESI allowed the leased premises to deteriorate to something far short of "first class." Specifically, in February of 2011, ESI anticipated that upon lease renewal "[l]arge capital repairs to the building will be required immediately." (PX-45 at 14; Doc. # 80 at 87).  In March of 2012, while analyzing the cost for ESI to relocate, ESI concluded that staying at the leased premises would require replacement of the "obsolete HVAC and electrical systems." (PX-50; Doc. # 80 at 87-88).  Further, in May of 2013, ESI described the property as "an aging building needing major work." (PX-51; Doc. # 80 at 88-89).

ESI also argues that Apple Glen cannot recover damages because it did not make all the disputed repairs and replacements, and might not ever make them, because it has entered into a lease with a new tenant. Apple Glen sought to obtain the same lease terms, but, in contrast with its lease with ESI, Apple Glen assumed responsibility for all repair and maintenance of the property in its new lease. (JX-13; Doc. # 78 at 128, 131-32).  The lease between the new tenant and Apple Glen is under substantially different terms. (Doc. # 78 at 205-207).  However, as explained below, Apple Glen's lease with the new tenant and whether Apple Glen or the new tenant will effect repairs or replacements at the property does not preclude Apple Glen from recovering damages for ESI's failure to comply with the lease.

As a matter of Florida law, in seeking damages for a tenant's breach of a covenant as to repairs, the fact that a lessor has not made the repairs or that the lessor has re-leased premises to a third party after the breach occurs does not affect the lessor's right to recover damages. See Pomeranc v. Winn-Dixie Stores, Inc., 598 So. 2d 103, 104 (Fla. 5th DCA 1992)("Neither the lessor's cause of action for breach of the lease nor the measure, or amount, of damages resulting from that alleged breach was lost, diminished, or destroyed by the conveyance of the leased premises by the lessor to a third party after the breach of the lease occurred. The lessor is under no legal obligation to the former lessee to use money recovered from the former lessee as damages for breach of the lease to restore or improve the sold premises.").

Generally, the Court finds that when ESI vacated, the leased premises were not in a first class condition and were in a condition beyond ordinary wear and tear due to ESI's lack of maintenance and failure to reasonably maintain the leased premises. Additionally, and as addressed below, certain items of the equipment and components were worn out or unusable for the purposes intended, and/or damaged, or destroyed. The Court addresses each of the identified physical deficiencies in turn below.

### 3.   **Twenty-Six Alleged Physical Deficiencies**

#### a.   **Asphalt Paving**

Apple Glen asserts, and the evidence shows, that the asphalt paving has substantial alligator cracking, alligator cracking with weeds growing through the cracks, surface erosion, aggregate degradation within the paving areas, numerous areas of root upheaval disturbing the sidewalk and curb, broken curbing, and areas holding water. (Doc. # 79 at 97-106; CMK Rpt. Doc. # 42-2 at 5; PX-107; Doc. # 78 at 112, 118-119, 121-122; PX-59B, 59C; 59F; 59H; 59N).  Apple Glen's expert, Keene, opined that the parking lot is no longer in a first class condition excepting ordinary wear

and tear, and estimated that to restore the parking lot to a first class condition the parking lot required to be stripped and sealed and would cost $217,793.55. (PX-75; PX-126-001, 002).  The CMK report also listed the asphalt pavement as not in a first class condition.  Although Ibarguen was only able to inspect the property for a short time, he observed "sizable expanses of exposed aggregate," "alligator cracking," "root heave," "significant cracking,"  "considerable fading of parking stripes," and "numerous broken or worn wheel stops."  (CMK Rpt. Doc. # 42-2 at 5).

ESI asserts that it repaired the parking lot every five years and last sealed and striped the parking lot in 2011. (Doc. # 77 at 141-142).  ESI's expert, Icely, opined that the condition of the parking lot and alligator cracking did not exceed ordinary wear and tear, the parking lot was ready for a seal coat estimated at approximately $12,000 to $15,000, generally a parking lot should be sealed every five to seven years, and ESI last sealed the parking lot in 2011.  (Doc. # 81 at 8-18).  Icely admitted that he did not know how often the parking lot for a first class commercial office facility should be repaved and there is "no set time frame" and "has a lot to do with wear and tear and how it's used." (Id. at 23).

The Court finds that the condition of the parking lot constitutes a physical deficiency exceeding ordinary wear and tear as defined by the ASTM industry standard and consistent with Keene's testimony.  As noted above, even ESI's expert, Icely, testified that the parking lot was cracked and was in need of repairs, including seal coating.   Therefore, the Court finds that ESI breached the lease obligations in paragraph 12(a).  Apple Glen is entitled to its claimed damages of $217,793.55 for the parking lot.

**b.**     **Concrete Sidewalks and Building Aprons**

Keene also opined that there were some areas around the perimeter of the building and a couple areas in the sidewalk where root upheaval had pushed the sidewalk up two to three inches

to create a significant tripping hazard, the sidewalks were no longer in a first class condition exceeding wear and tear, and the actual cost to remedy these deficiencies was $2,875.00. (Doc. # 79 at 112-114; PX-107; PX-125 at 19-20; PX-126-001, 003).  ESI's expert Icely also observed root heave at the sidewalks surrounding the perimeter of the building. ESI attempts to minimize the deficiency by asserting that this sidewalk is used only for maintenance, and is not a public use sidewalk. Icely opined that the condition of the sidewalks did not exceed ordinary wear and tear, but admitted that the condition of the sidewalk was "not right." He estimated that it would cost $1,500 to repair the sidewalks. (Doc. # 81 at 8-18, 24-25). No corroborating authorities or contractor proposals were offered to support Icely's estimate.

The Court finds that the condition of the sidewalks and building aprons constitute a physical deficiency exceeding ordinary wear and tear as defined by the ASTM industry standard and consistent with Keene's testimony.  As with the parking lot, ESI's expert admitted that the sidewalks were in need of repair.  In addition, the Court roundly rejects the argument that "maintenance" sidewalks should not be in a first class and safe condition.  Members of the public, business invitees, maintenance employees, and any other individuals on the premises need safe sidewalks that are free from tripping hazards (regardless of whether such sidewalks are designated as "maintenance" sidewalks). In addition, the lease does not differentiate between maintenance sidewalks and public sidewalks.  To the contrary, all portions of the leased premises, including all sidewalks were required to be maintained in a first class condition and order of repair. The Court accordingly determines that ESI breached paragraph 12(a) of the lease with respect to the sidewalks.  Apple Glen is entitled to damages for the sidewalks in the amount of $2,875.00.

c.    **Landscaping and Irrigation**

When ESI took possession of the leased premises, the landscaping and supporting irrigation system were in very good condition. (Doc. # 78 at 255).  Apple Glen contends, and the evidence shows, that at the time ESI left the leased premises, the leased premises had missing and poorly maintained landscape islands, broken irrigations lines, broken irrigation sprinkler heads, haphazard and deteriorated landscaping, and areas of dead plants. (PX-59E; Doc. # 79 at 115-117; Doc. # 78 at 120).  Additionally, the trees and landscaping had overgrown so as to touch the outside of the buildings. (PX-59NN; Doc. # 78 at 123; PX-107).  The CMK report described multiple dead trees, dead grass, and other serious deficiencies. (CMK Rpt. Doc. # 42-2 at 5). Apple Glen's expert's estimated cost for these repairs, as adjusted for the actual cost of work performed to date, was $15,082.11. (PX-126-001, 003).

In response, ESI asserted that it spent approximately $38,000 per year on landscaping and the date of its service agreement ended April 17, 2014. (Doc. # 77 at 128, 140; Doc. # 78 at 14; DX-111).  Icely opined that, although he noted one stump in a parking lot island, the building had a beautiful landscape and was lush and mature, and ESI did not exceed ordinary wear and tear. (Doc. # 81 at 10-11).  However, Icely inspected the leased premises one time on December 1, 2014, and did not know of the repairs that Apple Glen had made before his inspection.   (Doc. # 81 at 7, 25; PX-125 at 81-91).

After considering the relevant testimony, and especially since Apple Glen made repairs prior to Icely's inspection, the Court determines that ESI breached the lease with respect to the landscaping and Apple Glen is entitled to damages for the landscaping in the amount of $15,378.70.

d.    **Electrical Panels**

Apple Glen contends and the evidence shows that the electrical panels located near the entrance were badly deteriorated and rusted due to a complete lack of maintenance. (PX-107-7 at 4.2; Doc. # 79 at 117-119).  Apple Glen's expert estimated that the cost of the work to cure this deficiency was $461.97, including the contractor's fee and a general conditions charge. (PX-126-001, 004).  Icely agreed that the panels were in need of maintenance and estimated $300-$500 to make the repairs. (Doc. # 81 at 11).

Both sides agreed that the electrical panels required repairs, and the Court determines that the electrical panels constitute a physical deficiency exceeding ordinary wear and tear as defined by the ASTM industry standard and opinion of Keene. Therefore, this constitutes a breach of the lease obligations in paragraph 12(a).   The Court finds that Apple Glen is entitled to its claimed damages of $461.97 for the electrical panels.

### e.        Exterior Sealants at Concrete Panel Joints

In addition, Keene observed that the exterior sealants at the concrete panel joints are the original sealants from 1991, and have exceeded their useful life and should have been replaced. (PX-107; Doc. # 79 at 119-121).  Keene opined that the total cost of the work necessary to cure this physical deficiency, adjusted for the work performed to date, was $32,080.95, including the contractor's fee and a general conditions charge. (PX-126-001, 004). In contrast, Icely opined that the sealants he observed from the ground were in good condition, but he did not observe the top of the building. (Doc. # 81 at 11).

After considering the conflicting testimony, and given the age of the sealants, and the fact that the sealants were listed in the CMK report as deficient, the Court determines that they needed to be replaced.  The Court finds that the condition of the exterior sealants at the concrete panel joints constitutes a physical deficiency exceeding ordinary wear and tear as defined by the ASTM

industry standard and opinion of Keene. Therefore, this constitutes a breach of the lease obligations in paragraph 12(a).  Apple Glen is entitled to damages for these items in the amount of $32,080.95.

f.     **Roof Issues**

Keene testified that there was a cracked seal under the roof membrane, and his opinion of probable cost stated that it would cost $10,480.36 to repair the deficiency.  (Doc. # 79 at 124; PX-126).  But, he also admitted that the roof had been replaced by ESI and that it was still under warranty.  (Doc. # 80 at 117).  Keene was unaware if Apple Glen had contacted the roofer that issued the warranty to make any required repairs.  (Id. at 118).  In contrast, the CMK Report noted that the roof had been replaced and was in excellent condition.  The CMK Report gives the roof a condition score of 1, meaning first class condition.  (Ex. J8).

Icely testified that the cap sheet, which is exposed to the sun, was very healthy.  (Doc. # 81 at 12).  He found that the pliability of the caulk on top of the metal flashing is starting to give up and should be re-caulked, at a cost of $3,000-5,000.  (Id. at 13).  Icely did not observe any "ponding" on the roof, but he testified that even if there had been ponding, "According to the National Roofing Contractors Association, which obviously supports its membership in regulating the roofing industry, they say that ponding on the roofing -- on a roof is not an issue if it dries within 48 hours." (Id.).  Keene did not testify that he observed ponding that lasted 48 hours.  Icely concluded that nothing exceeded ordinary wear and tear on the roof. (Id.).

After due consideration, the Court determines that Apple Glen has not demonstrated any breach of the lease as to the roof.  The record shows that ESI replaced the roof during its tenancy and that the roof was still under warranty at the relevant time.  Apple Glen is accordingly entitled to no damages as to the roof.

g.     **Skylights**

35

Case 8:14-cv-01527-VMC-EAJ   Document 86   Filed 03/10/16   Page 36 of 65 PageID 3030

The skylights had encapsulated moisture between the two lawyers of the domes. (Doc. # 79 at 124-127; Doc. # 78 at 111-127; PX-59T, PX-59PP).  Keene opined that the total cost to seal the skylight panels and remedy the physical deficiency is $6,159.49. (PX-126-001, 004).

ESI does not contest the leaks from the skylights. (Doc. # 80 at 250).  ESI's expert, Fairbrother, however, attributed the leaks from the skylights "primarily to the original design," and opined that they would continue to leak regardless of maintenance. (Id. at 250-251). Apple Glen argues that even if there is a design defect and even if maintenance would not cure the deficiency, ESI was still required to "put," "repair," and/or "replace" the skylights to meet the first class condition required by the lease. (Id. at 264-265).

The Court agrees with ESI on this point.  Even with a unique bonded lease, it would be unfair to require the tenant to redesign the building and reconstruct architectural details, such as defectively designed skylights.  In addition, the record reflects that the skylights are still under a warranty. (Doc. # 78 at 202).  Thus, Apple Glen is not entitled to the claimed amount of $6,159.49.

### h.    Exterior Walls – Paint & Sealer

On the building exterior, Keene observed a lack of maintenance in several areas that needed intensive cleaning, including a number of rust spots showing through some of the architectural concrete panels, areas of mildew and discoloration, and a severely stained screen wall. (Doc. # 79 at 127-129; PX-107). Apple Glen performed a portion of this work. (PX-125).  Keene posited that the total cost to perform this work, adjusted for the cost of work performed to date, was $26,843.63. (PX-126-001, 005).

ESI asserts that it pressure washed the building for $18,000 every year. (Doc. # 77 at 130). Icely opined that the exterior walls were normal for what he would expect to see on a Class A building, but he did determine that the mechanical rooftop unit wall screens that surround the air-

conditioning equipment needed to be pressure washed and painted, which would cost approximately $12,000 to $15,000. (Doc. # 81 at 14-15).

Based on ESI's own expert testimony, the Court finds that the condition of the exterior walls constitutes a physical deficiency exceeding ordinary wear and tear as defined by the ASTM industry standard and Keene's opinion. Therefore, this constitutes a breach of the lease obligations in paragraph 12(a). Apple Glen is entitled to damages for this deficiency in the amount of $12,000.00, based on Icely's estimation.

### i.  Exterior Glazing

Keene opined that the perimeter of the glazing system between the store front glazing system and the concrete panels had exceeded its useful life, along with the splice joints, and contributed to the water intrusion. (Doc. # 79 at 130–133; PX-107).  Keene remarked as to the cost of the work necessary to repair this deficiency (PX-75), and Apple Glen performed and paid for the work. (PX-125). Based on the work actually performed, the cost of repairs was $135,642.44. (PX-126-001, 005).

In contrast, Icely indicated that he did not see evidence of water intrusion relating to the exterior glazing and he did not recommend any repairs to the exterior glazing. (Doc. # 81 at 15-16).  Icely opined that, generally, systems are designed to be self-draining, despite any sealants. However, Icely ultimately admitted that he did not know what, if any, sealant was used on this particular system. (Id. at 31).

After due consideration, the Court finds that the condition of the exterior glazing constitutes a physical deficiency exceeding ordinary wear and tear as defined by the ASTM industry standard and opinion of Keene. Therefore, this constitutes a breach of the lease obligations

in paragraph 12(a).  Apple Glen is entitled to damages to for this deficiency in the amount of $135,642.44.

### j.   Interior Finishes

The evidence shows that, on the inside, ESI left the leased premises with missing doors, delaminated wall covering, damaged bathroom countertops and partitions, plumbing fixtures that had pulled away from the wall, and holes in the tile.  (Doc. # 79 at 134-137; PX-107 at 15-17). Keene estimated that the total cost to repair these physical deficiencies to be $13,425.98. (PX-126-001, 006).

Icely, on the other hand, opined that the building was very well maintained and looked very clean, but he did not inspect the building until nine months after ESI vacated. (Doc. # 81 at 32). Upon due consideration, the Court finds that the condition of the interior finishes constitutes a physical deficiency exceeding ordinary wear and tear as defined by the ASTM industry standard and opinion of Keene. Therefore, this constitutes a breach of the lease obligations in paragraph 12(a).  Apple Glen is entitled to damages for this deficiency in the amount of $13,425.98.

### k.   Elevators

Shortly after ESI vacated, an elevator had to be shut down because it was leaking and not working, and its replacement was recommended. (Doc. # 78 at 259-260; PX-59J).  Dubuque reported that it took "a couple months to get [the] elevators back into service" and they were "in much worse shape than we thought." (Doc. # 78 at 140).  Apparently, "there were people from Citigroup getting stuck in the elevators." (Id.). Apple Glen had the manufacturer of the elevators and two independent elevator consultants attempt to get the elevators working. (Id.). Apple Glen's new tenant sent Apple Glen a letter demanding elevator replacement after passengers were stuck

in one elevator car.   (Id. at 68, 140).   Apple Glen's broker, Sharon Bragg, also reported experiencing problems with the elevators with potential tenants. (Doc. # 80 at 222-223).

Keene determined that the components of the twenty-three year old elevators were beyond their useful life, obsolete, and in need of repair, and numerous elevator components are no longer available, in contravention of both lease paragraphs 12(a) and 12(d). (Doc. # 80 at 137-139). Keene opined that the cost to remedy this deficiency, adjusted for the work performed to date, was $134,691.96. (PX-126-001, 006).

ESI had a Platinum Maintenance Agreement with the elevator company for $405 per month. (Doc. # 77 at 141; DX-98).   ESI's expert, Tray Edmonds, opined that the elevator equipment and components have been maintained in accordance with industry standards and with continued quality elevator maintenance and there is no indication of signs of exceeding ordinary wear and tear; the elevators do not need to be replaced, are not obsolete, and it was not necessary to conduct the modernization of the elevators. (Doc. # 80 at 272-283).   However, Edmonds admitted that it is not normal for an elevator to trap riders inside the cars. (Id. at 285-286).   The Court was not persuaded by ESI's expert, who testified that it was not necessary to modernize the elevators, because the testimony on the record, including accounts of several persons being trapped in elevators cars, demonstrates a serious and dangerous issue with the elevators at the leased premises.

The Court finds that the condition of the elevators constitutes a physical deficiency exceeding ordinary wear and tear as defined by the ASTM industry standard and opinion of Keene. Therefore, this constitutes a breach of the lease obligations in paragraphs 12(a) and 12(d).   Apple Glen is entitled to damages for this physical deficiency in the amount of $134,691.96.

### l.   <u>Missing Kitchen and Food Service Equipment</u>

Apple Glen seeks to recover $304,970.49 to replace certain kitchen equipment that was allegedly missing from the leased premises after ESI vacated the premises.  (Doc. # 80 at 19; PX-126). The Court finds that Apple Glen failed to present competent evidence as to what food service area equipment was located on the premises when ESI took over the lease. Keene testified that Cruz told him what was on the property when ESI began its occupancy, but he admitted that Cruz had no specific inventory.  (Doc. # 80 at 130-131).

Cruz had no actual knowledge of what kitchen equipment was on the premises when ESI took possession, or at any other time.  (Doc. # 78 at 296).  He never had a specific inventory of the property on the premises when Solomon Brothers left, and his testimony was more of a foggy and incomplete recollection than a detailed list upon which the Court could base a $304,970.49 damages award.  (Id. at 251, 296-297). Cruz mentioned that coffee urns and an ice machine were missing, however, he never explained how these items, or any others, add up to the claimed amount of $304,970.49.

In addition, Cruz relied upon an example of the kitchen equipment that was in the building plans.  (Id. at 296-297).  However, the building plans were not admitted into evidence.  The Court finds that Keene's testimony that it would cost $304,970.49 to replace kitchen equipment at the premises was not credible because he had no personal knowledge of the kitchen equipment that was located on the premises when ESI took possession of the leased premises. He testified that he came out to the property after ESI vacated and did an inventory of what was there and compared it against the list of equipment identified on the building plans.  (Doc. # 80 at 129-130).  Keene admitted that he had no knowledge of what was on the premises when ESI took possession ten years later.  (Id. 130).

In contrast, Reyes credibly testified that ESI had a full service kitchen in use every day until ESI vacated the Leased Premises and that the equipment in the food service area was functioning properly when ESI vacated.  (Doc. # 78 at 5-6).  She also testified that ESI's food service operator served hot and cold food a week prior to ESI vacating the Property.  (Id.).  She testified that ESI removed no equipment from the food service area when it vacated; rather, the food service company, Oasis Refreshments, removed equipment such as toasters and small wear items because that equipment belonged to them.  (Id. at 6).

In addition, Waltz testified that the kitchen was in excellent condition with no signs of damage or any indication that ESI removed kitchen equipment. (Waltz Dep. at 22). Waltz specifically described vital kitchen components, such as the dishwasher, convection oven, beverage service area, exhaust canopy, fryer, food display case, and other items as in "excellent" condition. (Id. at 8-22).  Waltz provided thoughtful testimony based on his many years of experience in the food industry, and the Court finds his testimony concerning the food service area and kitchen more credible than the lay testimony provided by Cruz.

The Court finds that there is no evidence of what food service equipment was on the premises when ESI took possession, and although the building plans (which were not admitted into evidence) may show what was intended to be placed on the premises, those plans are not evidence of what was actually there.  Therefore, Apple Glen has failed to demonstrate that it is entitled to any damages as to the kitchen and food service equipment.

### m.   Kitchen Hood and Vent Systems

Although the Court has generally found in favor of ESI on the kitchen-related items, the Court determines that Apple Glen is entitled to compensation with respect to the kitchen hood and vent systems.  Keene testified that the kitchen hood and vent systems were covered in grease and

otherwise not maintained in accordance with National Fire Protection Association requirements. Apple Glen paid $1,911.15 to remove the grease to eliminate the safety risk presented. (Doc. # 80 at 20).

The Court finds that the condition of the kitchen hood and vent systems constitutes a physical deficiency exceeding ordinary wear and tear and in breach of the lease. Apple Glen is accordingly entitled to $1,911.15 for the grease removal.

### n.      Fire Sprinkler Systems

Keene testified that Apple Glen spent $42,586.84 to install new drains required by the Fire Marshal.  (Id. at 22; Ex. P126).  He testified that the drains at the property were inadequate to conduct a certain test that the Fire Marshal required.  Keene admitted that the test required by the Fire Marshal after ESI vacated the property was not the same test required by the Fire Marshal when ESI occupied the property.  (Doc. # 80 at 135-136).  The CMK Report stated that the fire alarms were in very good condition, score of 1, first class condition.  The CMK Report did not mention any deficiency in the sprinklers.  (Ex. J8).

The Court determines that although the Fire Marshal required the installation of new drains in order to maintain the building's Certificate of Occupancy, this occurred after ESI vacated the premises, and there is no evidence that ESI failed any Fire Marshal testing during its tenancy.  The Court will not penalize ESI by requiring it to pay for fire sprinkler upgrades required by the Fire Marshal after ESI vacated the premises.  Apple Glen is not entitled to damages for fire sprinklers.

### o.      Plumbing – Hose Bibs and Water Heater

With respect to plumbing matters, Keene testified that the hose bibs were not functioning, had duct tape on them with "do not use" signs, and constituted a deficiency under lease paragraph 12(a).  (Doc. # 80 at 23-25; PX-107 at 21). Dubuque also testified that the hose bibs were

inoperable and bore signs stating "do not use." (Doc. # 78 at 122; PX-59J).  Keene estimated that

replacing the hose bibs would cost approximately $3,776.00.  Keene also testified that the water

heater in the kitchen was last replaced in 2009, had deteriorated over time, was beyond its useful

life, worn out, and unusable for the purposes intended and constituted a deficiency under

paragraphs 12(a) and 12(d).  Apple Glen replaced the water heater for $6,432.00. (Doc. # 80 at 25-

26; PX-125 at 17-18; PX-126-001, 010).

       The Court acknowledges that ESI offered testimony to the contrary, but after considering

all of the evidence, finds that the condition of the hose bibs and water heater constitutes a physical

deficiency exceeding ordinary wear and tear as defined by the ASTM industry standard and

consistent with Keene's testimony. Apple Glen is entitled to damages for these deficiencies in the

amount of $10,208.00 ($6,432.00 for the water heater and $3,776.00 for the hose bibs). (PX-126,

001).

### p.    HVAC Chiller Plants

       Keene opined that the condition of the four HVAC chiller plants constitutes a physical

deficiency because this equipment is beyond its useful life, unreliable, not in a first class condition

(even assuming that ESI performed routine maintenance), worn out and unusable for the purposes

intended, and a breach of lease paragraphs 12(a) and 12(d). (Doc. # 80 at 26-29). Keene stated that

the chillers are critical to the redundancy of this mission critical facility, are twenty-three years old

and unreliable, as they are on "borrowed time," and will take three and half months to replace

when the equipment fails. (Id. at 27, 29-31). Further, the existing equipment uses R-22 refrigerant,

which is not permitted in new equipment by federal legislation because it is an environmental

hazard. (Id. at 28).   Keene estimated that the total cost to replace the HVAC chiller plants is $1,367,382.58. (PX 126-001, 010).

Fairbrother disagreed and opined that the chillers were in excellent condition. (Doc. # 80 at 253). Based on the timing devices on the chillers, he stated that each chiller had operated for approximately twelve or thirteen years. (Id.). He opined that it is not difficult to obtain Refrigerant-22. (Id. at 253-254).  Fairbrother also opined that new chiller models are not more reliable than the existing equipment because he had seen projects where the old chiller units are still running, and the newer units were "sitting on the side because it's causing them so much trouble in terms of repairs." (Id. at 254).

After careful consideration, the Court determines that ESI breached the lease with respect to the HVAC chiller plants.  The Court awards Apple Glen the amount requested of $1,367,382.58 for HVAC chiller plants.

### q.      HVAC Cooling Towers

Keene testified that the HVAC cooling towers were rusted with scaling on the coils, which constituted a lack of maintenance and a physical deficiency under Lease paragraph 12(a). Based on a review of ESI's maintenance records, Keene reported that the last time that ESI pressure washed and cleaned the cooling towers was in April of 2012. (PX-107 at 22-23; Doc. # 80 at 33-36).  Keene testified that it would cost $9,640.31 to clean the scale off, scrape the rust off, and repaint the towers. (Doc. # 80 at 36).

In response, ESI asserts that it had a contract with a company known as ABM Building Services for approximately $100,000 per year for preventative maintenance through 2014. (Doc. # 77 at 136).  The Court determines that ESI carefully and meticulously maintained the HVAC

system.  If rust and scaling was present on the HVAC, the Court finds that it was consistent with wear and tear and did not rise to the level of a breach of the lease.

<strong>r.      HVAC Custom Chilled Water Air Handlers</strong>

In addition, Keene opined that the roof-mounted HVAC custom air handling units are the original equipment from 1991, and based on his analysis, the opinions of every one of the contractors he consulted, and ESI's internal documents, the equipment exceeded its useful life, is worn out, obsolete, and must be replaced. (Doc. # 80 at 36-37).  Keene opined that the condition of the units constitutes a deficiency under Lease paragraphs 12(a) and 12(d). (Id. at 41; PX-107 at 24-25). This equipment reached the end of its useful life sometime before March 31, 2014. (Doc. # 80 at 44). Instead of replacing the entire piece of equipment, however, Keene reports that the housing appeared to have been maintained and could be salvaged. Therefore, only the inside components require replacement, resulting in a less onerous process and cost saving of $400,000. (Doc. # 80 at 37-41).  Keene estimated that the total cost to remedy the physical deficiencies in the HVAC Custom Chilled Water Air Handlers was $854,866.24.  (PX 126-001, 011).   Likewise, Ibarguen stated in the CMK report that "all four original Marcraft custom air handlers are at the end of their useful life and should be replaced." (CMK Rpt. Doc. # 42-2 at 10).  He gave the air handlers, as well as the chillers, a score of "4" – which is not in keeping with a first class condition and order of repair.

In contrast, Fairbrother opined that that the air handlers did not need to be replaced. (Doc. # 80 at 254-255).  Additionally, Reyes testified that ESI spent $91,000 on refurbishment of the air handlers at one time, but no evidence indicates what type of work was performed or when this work was performed. (Doc. # 77 at 84, 124-125).

ESI commissioned an HVAC assessment in March 2010, which concluded that the HVAC chillers and air handlers were nearing the end of their useful lives. (Doc. # 80 at 42-44; PX-37 at 1, 3, 5).  In May of 2010, ESI commissioned a second HVAC assessment, and this report also concluded that this equipment was nearing the end of its useful life and provided an estimate of about $2 million to replace the air handlers, chillers, and pneumatic control system, but ESI did not complete this work. (PX-38; JX-6; Doc. # 77 at 72-74).

The Court finds that the condition of the HVAC chilled water air handlers constitutes a physical deficiency exceeding ordinary wear and tear as defined by Keene and the ASTM industry standard. Therefore, this constitutes a breach of the Lease obligations in Paragraph 12(a) and 12(d). Apple Glen is entitled to damages for this deficiency in the amount of $854,866.24.

### s.       HVAC Building Controls

Keene also explained that ESI has started to convert the HVAC building controls from older pneumatic controls to digital controls, but that ESI had not completed the work. Specifically, Keene testified that "as we all know, we live in a digital world these days and so there is digital controls . . . a fair amount of these controls, Express Scripts was in the process of changing these out.  It just didn't get completed." (Doc. # 80 at 48). Keene indicated that the remaining pneumatic controls were "obsolete." (Id. at 49).   Keene reported that the total cost to cure this physical deficiency is $37,426.21. (PX 126-001, 012).

In contrast, Fairbrother testified that he thought that the system was not outdated and that the system would last for another ten years. (Doc. # 80 at 258-259).  However, Fairbrother's testimony about how long the system could potentially "last" is not indicative of whether the existing building control system was in a first class condition and order of repair.  The Court is particularly persuaded that it was necessary to implement digital controls because ESI started to

perform this overhaul itself, but merely failed to complete the task. After due consideration, the Court finds that the condition of the HVAC building controls constitutes a physical deficiency exceeding ordinary wear and tear and as defined by Keene and the ASTM industry standard. Therefore, this constitutes a breach of the Lease obligations in Paragraph 12(a) and 12(d). Apple Glen is entitled to damages for this deficiency in the amount of $37,426.21.

### t.    Building Management System

Reyes testified that ESI installed a building management system, which controlled the HVAC system, in 2006. (Doc. # 77 at 75). She further testified that ESI took the building management system when ESI vacated the premises. (Id. at 74-75). ESI did not damage the property in any way when it removed the building management system and ESI did not otherwise damage property when it vacated. (Doc. # 78 at 7-9). Reyes explained that the software system belonged to ESI and was "tied to our server in New Jersey. Meaning anybody that could access that computer had access to our servers." (Doc. # 77 at 75). She also testified that even without the automated system, you could control the temperature of the building manually. (Id.).

Keene testified that Apple Glen spent $62,678.93 to replace the building management system. (Doc. # 80 at 50; Ex. P126). Although the testimony is somewhat murky on this point, it appears to the Court that a building management system was in the building when ESI began its tenancy. ESI removed the existing system and replaced it with something different. When ESI vacated the building, it took its system and did not hook up the original system that was present back when ESI began its tenancy. The record reflects that Apple Glen requested that ESI replace the building management software, and that ESI intended to do so. (Doc. # 77 at 74; PX-136; DX-123; Doc. # 78 at 13-14; 153-154). However, ESI never came through and, as a result, Apple Glen was left with a 139,000 square foot, three-story commercial office building in Florida in need of

air conditioning without a building management system. (Doc. # 77 at 77). This constitutes a breach of the lease and Apple Glen is entitled to damages for replacing the building management software in the amount of $62,678.93.

### u.   Security and Monitoring System

Apple Glen seeks $117,491.03 to install or otherwise repair the security and monitoring system at the leased premises.  In support, Apple Glen points to Cruz's testimony in which he states that at the time ESI took possession of the Leased Premises, the security camera system had recently been updated. (Doc. # 78 at 255).  He stated: "We updated the camera system.  We added cameras all in the open areas, workers' areas when SBC was there." (Id.). After ESI vacated, Cruz testified that the security system wiring was disconnected and the main control for the security system was missing. (Id. at 258). Similarly, Dubuque testified that the security cameras "were inoperable" and that "the wires were ripped out." (Id. at 123-124; PX-59NN).  When asked, "is it first class to have a building with inoperable security equipment," Keene answered, "It is not." (Doc. # 80 at 50-51).

ESI asserts that it should not be required to pay any damages for a security system because the security system is a "Trade Fixture or other personal property" under paragraph 20(f) of the Lease. However, ESI has not shown that it owned the security system to be permitted to remove it under Paragraph 20(f) of the Lease. Alternatively, even if ESI owned the security system and/or owned the security system that it later installed, it became the property of Apple Glen under Paragraph 24(a).

The evidence shows that the leased premises had a security and monitoring system when ESI took the assignment and that this equipment was missing, inoperable, and damaged when ESI relinquished the premises to Apple Glen.  ESI breached the lease with respect to the security

48

monitoring system, and Apple Glen is accordingly entitled to damages for this deficiency in the amount of $117,491.03.

### v.      Lightbulbs and Ballasts

Keene testified that Apple Glen spent $3,368.02 to replace light bulbs and ballasts at the premises.  (Doc. # 80 at 52; Ex. P126)  Keene had no personal knowledge as to what was missing from the premises; instead, he relied on Cruz, who provided a list of the light bulbs and ballasts that were missing.  (Doc. # 80 at 150).  He only noticed that they were missing on his inspection of the property, which was four months after ESI vacated the premises.  (Id.).

The CMK Report stated that the electrical was in very good condition, score of 1, first class condition.  (Ex. J8).  Reyes testified that all light bulbs and ballasts worked properly when ESI vacated the Premises and that ESI left additional inventory behind.  (Doc. # 78 at 13).  In addition, Fairbrother testified that there are about 3,600 fluorescent tubes at the property and he was not surprised that there were a couple hundred of them at any point that might have a problem, "it's pretty common."  (Doc. # 80 at 255).

The Court determines that Apple Glen is not entitled to any damages for burnt out lightbulbs and ballasts.  The fact that lightbulbs and ballasts were burnt out four months after ESI vacated the premises does not prove by any means that ESI left the building in a deficient condition when it actually vacated the premises.  Had an Apple Glen representative documented burnt out lightbulbs and ballasts at or near the time ESI vacated the premises, the Court's conclusion might have been different.

### w.      Uninterruptable Power (Switchgear Breaker)

Keene testified that it would cost $58,581.99 for switchgear breaker maintenance.  (Doc. # 80 at 55; Ex. P126).  But, Keene is not an electrician, and he admitted that the breaker test, which

has not been done, is necessary to determine if any of the breakers are not working properly.  (Doc. # 80 at 152-53).  He simply assumed that 5% of the breakers would require replacement.  (Id. at 153).  He did not know whether ESI left behind any spare breakers.  (Id.).  Keene admitted that he was unaware of any repair or replacement that is required of the switchgear breaker and testified generally he understood that testing was overdue.  (Id. at 154).  There is no evidence that Apple Glen has incurred any actual cost to perform this testing or maintenance.  (Id.).

The CMK Report stated that the breakers were in very good condition, score of 1, first class condition.  (Ex. J8).  Likewise, Fairbrother testified that breakers were well maintained and functional.  (Doc. # 80 at 255).  He believed that the breakers were not obsolete because they were running and he did not see any problem with how they were operating.  (Id. at 256).  Fairbrother also testified that it did not matter that the manufacturer was not supporting the equipment because other parties sell the parts to maintain the system.  (Id.).  After careful consideration, the Court determines that Apple Glen has not demonstrated a breach of the lease as to the switchgear breakers.

### x. Uninterruptable Power System

Cruz testified that at the time ESI took over the tenancy of the Leased Premises, the UPS system was operational and had all of its six battery strands.  (Doc. # 78 at 254-255).  However, after receiving the keys on March 31, 2014, Cruz observed that only two of the UPS system banks were "online," while a third UPS was off, and two UPS battery strands were missing.  (Id. at 256-257).  Dubuque also testified that two UPS battery strands were missing and the UPS system racks had signs on them that said "danger, do not turn on," "power down," and "do not switch on."  (Id. at 114; 120-121).  Apple Glen's video clip received into evidence corroborates Dubuque's testimony. (PX-59EE).

Keene determined that based on the useful life studies and information supplied by the UPS electrical contractors, the UPS system was beyond its expected useful life and needed to replaced. Evidence shows that the UPS system equipment is no longer supported by the manufacturer and that two battery strands were missing.   Keene opined that the technology of these units has been revised many times over the years since 1991. If one of the units were to break, it would take two and half to three months to get a replacement unit, and a replacement unit would not be compatible with the existing units, so all three would require replacement. In a mission critical facility, this critical piece of equipment that instructs the generators and maintains the power in the building requires immediate replacement.  The equipment could not be considered in a first class condition and was worn out and no longer usable for the purposes intended. (Doc. # 80 at 55-58).

According to Reyes, none of the UPS system racks had signs that said, "danger, do not turn on." (Doc. # 78 at 12).  ESI's expert Larry Fairbrother opined that the UPS breakers were well maintained and functional, were not obsolete, and even though the manufacturer is not supporting them anymore, the owner can obtain access to parts for the machinery as the parts are available through other sources. (Doc. # 80 at 255-256).

ESI had a contract with Eaton for UPS system preventive maintenance for about $25,000 per year. (DX-114; Doc. # 77 at 140; Doc. # 78 at 14).  Reyes testified that ESI spent half a million dollars replacing UPS batteries at one time. (Doc. # 77 at 124-125). Reyes testified that Eaton, the manufacturer of the UPS system, recommended that ESI replace the old UPS system. (Id. at 71). However, Reyes planned to wait to replace the UPS system until the UPS system failed beyond repair. (Id.).

The Court finds that the condition of the UPS constitutes a physical deficiency exceeding ordinary wear and tear as defined by the ASTM industry standard and by Keene in his capacity as

expert witness. Therefore, this constitutes a breach of the Lease obligations in paragraph 12(a) and 12(d). Apple Glen is entitled to damages for the total cost to remedy this deficiency in the amount of $1,638,373.96. (PX-126-001, 014).

### y.   Electrical Generator System

Keene testified that the Leased Premises' analog system for controlling the electrical generators is deficient under lease paragraphs 12(a) and 12(d) and must be replaced because it is no longer supported by the manufacturer, replacement parts for it are unavailable, and it has exceeded its useful life.  Keene also noted a lack of maintenance because ESI last performed a load test in 2008. (Doc. # 80 at 58-61).  However, Keene's expert report stated: "The generator engines are at approximately 4000 hours of operation with a useful life expectancy of 10,000 hours. Therefore, the generators' engines should have many years of service remaining as long as the engines are properly maintained." (Doc. # 42-1 at 15).

ESI's expert, Fairbrother, opined that the whole appearance of the generator room and the generator equipment was "absolutely wonderful" and it was "clean as it could possibly be and looked like it was brand-new installation." (Doc. # 80 at 256-257).  The CMK Report stated as follows, as to these components:

> The RS&H report indicated the building electrical systems were in generally good condition.  The systems were designed to provide backup power and a high degree of redundancy as required for a tenant needing completely reliable power 24 hours a day.  The current tenant . . . utilizes less than 30% of the building's power capacity and as such has not made extensive use of the backup power systems, although they are well maintained and in good working order. . . .
> a.  Main Electrical Service/Distribution System:  all components are in good condition. **CONDITION SCORE: 1.**
> b. Generators: two of the four generators are relatively new, and all are in good condition. **CONDITION SCORE: 1.**

(CMK Rpt. Doc. # 42-2 at 10).

The Court is persuaded by the analysis contained in the CMK report, which Apple Glen itself commissioned.  The Court determines that Apple Glen is not entitled to the amount claimed for generators: $239,532.43.

### z.     Liebert UPS Room Air Conditioning Units

Keene opined that the Liebert UPS room air conditioning units have exceeded their useful life, are no longer in a first class condition, are worn out, fail to provide the reliability necessary in a mission critical facility, and are a deficiency under lease paragraphs 12(a) and 12(d). (Doc. # 80 at 61-62).  Notably, his expert report did not mention anything about the Liebert units, nor were those units mentioned in the CMK report.   In addition, it appears that Keene recommended replacement of the Liebert units because they are not "100% reliable." (Id.).  However, he admitted that the units were functioning. (Id.).    Although Apple Glen seeks $231,657.68 to replace the Liebert units, the Court determines that Apple Glen has not established that those units were deficient or in need of repair or replacement.

### 4.     Additional Miscellaneous Items

Apple Glen also seeks to recover $203,125.41 in damages for alleged deficiencies that Keene overlooked but were later identified by Cruz.  (Doc. # 78 at 141-146, 266-286).  Cruz explained: "That is stuff we had to spend money on that was either before hiring Mr. Keene or stuff that happened that was under Mr. Keene's radar screen.  And, you know, it adds up." (Id. at 141).  Cruz listed some examples, such as bare landscaping, plumbing leaks, damaged toilet seats, broken window glass, defective fire sprinkler system valves, rusted cooling tower, dirty kitchen equipment, and backed-up drains.

The Court determines that Apple Glen is not entitled to these damages.  First of all, many of these items – such as "bare landscaping" and "dirty kitchen equipment" should have been amply covered above and it appears that Apple Glen is seeking double damages, which is unfair and not

permitted.  Even for those items that are not already covered in this order, such as broken window glass, backed-up drains, and others, it appears to the Court that Apple Glen is seeking to recover maintenance obligations it incurred after ESI vacated the property.  Apple Glen established that it did not have a duty to maintain the property during ESI's tenancy, but ESI's maintenance obligations terminated when ESI vacated the premises.   Apple Glen has not persuaded the Court that it is entitled to $203,125.41 for miscellaneous repairs that it undertook after ESI vacated the property.  These repairs were consistent with the normal maintenance that Apple Glen undertook after ESI vacated the property and before a new tenant was secured.

### 5.  Apple Glen's Excess Utilities Claim

Apple Glen asserts that ESI's removal of the computer system to control the HVAC system resulted in astronomical electricity bills for five and one-half months (from mid-April to August 2014), until Apple Glen installed a new system. (PX-77, PX-122; Doc. # 78 at 115-117, 260-265; Doc. # 80 at 49-50, 236-238).  Cruz testified that multiple contractors worked to control the air conditioning manually until the installation of the new system and worked for about year until the new system became fully operational.  (Doc. # 78 at 260-265).  Apple Glen's electricity bills beginning in September of 2014, are much lower than in months prior. (PX-124). Apple Glen calculated its excess electricity expenses by taking the per diem difference and multiplying it by the number of days in the month resulting in a total of $56,227.00. (Doc. # 78 at 149-152; PX-77, PX-122).

ESI admits that it removed the Building Management System, but argues that Apple Glen did not present competent evidence regarding the electricity bills.   The Court agrees with ESI on this point.  To establish the "excessive" electricity bills, Apple Glen offered lay testimony from a witness (Dubuque) who testified that he simply compared various electric bills with one another

before and after the installation of the new Business Management System. It does not appear that these calculations took into consideration the natural temperature fluctuations that occurred during the relevant time. Because Apple Glen did not present competent evidence regarding its electric bills during the relevant time, the Court declines to impose damages for excessive electric bills. In making this determination, the Court also takes into consideration that Apple Glen waited for nearly five months after it discovered that the Building Management System was gone to install a new Building Management System. In addition, Apple Glen failed to account for the fact that it was capable for manually adjusting the air-handler units, chillers, cooling towers and other facilities. Accordingly, Apple Glen is not entitled to the claimed $56,227.00 in damages for allegedly excessive electrical bills.

### 6. **Apple Glen's Lost Rent Claim**

Apple Glen seeks damages for six months of lost rent in the amount of $968,750. Apple Glen indicates that the lost rent is for the amount of time it conservatively would take to repair, replace, and/or restore the leased premises and equipment to a first class condition. The building was listed for $15.50 per square foot in rent when ESI vacated. Based on the square footage in the lease of 125,000 sq. ft. multiplied by $15.50 equals $161,458.33 per month in lost rent, or $968,750.00 from May 31, 2014, to October 31, 2014. (Doc. # 78 at 146-149; PX-128).

After due consideration, the Court determines that Apple Glen is not entitled to these damages. The property is currently leased to Citigroup, which occupies the premises. The Citigroup lease permits Citigroup to renew and extent the lease term until December 31, 2034. There is no lease provision that would require Citigroup to vacate the premises or cease paying rent while Apple Glen undertakes repairs to the premises or equipment.

Most importantly, there is no credible evidence that the repairs in question would take six months to complete, or that the building would need to be vacated to undertake the repairs. Keene indicated that he believed it would take two months of planning (such as ordering the new equipment) and four months for the actual work. He admitted that the building did not need to be vacated for the repairs to take place. In light of this evidence, ESI is not liable for lost rent.

## C.    ESI's Affirmative Defenses

ESI asserted various affirmative defenses to Apple Glen's breach of contract claim. It is ESI's obligation to come forward with evidence to support each of its respective affirmative defenses. "The reason is that the defendant bears the burden of proof on his affirmative defenses at trial." Office of Thrift Supervision v. Paul, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997) (citing Thorsteinsson v. M/V Drangur, 891 F.2d 1547, 1550–51 (11th Cir. 1990)). None of ESI's affirmative defenses preclude Apple Glen's claim.

### 1.    Notice (First, Second, and Third Affirmative Defenses)

ESI argues that Apple Glen failed to provide it with the requisite notice of breach, pursuant to Lease paragraph 20(a)(ii), which provides that: "failure by Tenant to perform and observe, or a violation of breach of, any other provision in this Lease and such default shall continue for a period of thirty (30) days after written notice thereof is given by Landlord to Tenant." (PX-4 at ¶¶ 20(a)).

The Court has already found that "Apple Glen did provide written notice to ESI that the leased premises and equipment were not being properly maintained. In fact, on two separate occasions before the termination of the Lease, Apple Glen provided written notice to ESI asserting that the premises and equipment were in an unsatisfactory condition." (Doc. # 55 at 12-13). The Court stands by its previous decision and holds that ESI was on notice of the alleged deficiencies. The Court finds that ESI had adequate notice of maintenance deficiencies and that Apple Glen

complied with lease paragraph 20(a)(ii).  Accordingly, the Court finds for Apple Glen on ESI's first, second, and third affirmative defenses.

To the extent that ESI did not receive sufficient notice of Apple Glen's claims (which it did), any failure to provide notice does not constitute waiver of Apple Glen's claims. The lease preserves Apple Glen's rights to enforce the lease pursuant to the non-waiver provision and provisions stating that Apple Glen had no obligation to inspect the premises. (PX-4 at ¶¶ 21(a), 34(d), 12(c), 28, 20(b)(v), and 21(a)). Florida courts consistently enforce non-waiver provisions. See Nat'l Home Communities, L.L.C. v. Friends of Sunshine Key, Inc., 874 So. 2d 631, 634 (Fla. 3d DCA 2004) (finding that anti-waiver provision in lease precluded tenant's waiver argument) (collecting cases); Bradley v. Sanchez, 943 So. 2d 218, 222 (Fla. 3d DCA 2006) (enforcing provision in real estate purchase contract precluding waiver of any contractual term absent written modification of the contract); Rybovich Boat Works, Inc. v. Atkins, 587 So. 2d 519, 522 (Fla. 4th DCA 1991) (waiver defense was "defeated as a matter of law by the [anti-waiver] provisions of the contract itself").  Public policy favors the enforcement of contracts. See, e.g., Pods, Inc. v. Paysource, Inc., 8:05-cv-1764-T-27EAJ, 2006 WL 1382099, at *4 (M.D. Fla. May 19, 2006).

The lease does not require the notice to be given within any specific time, and ESI certainly had an opportunity to cure or mitigate in response to Apple Glen's notices, but ESI did neither. To the extent that ESI did not receive sufficient notice of Apple Glen's claims (which it did), Apple Glen's notices to ESI were futile. ESI received at least three written notices from Apple Glen, has been on actual notice of its obligations and the leased premises' condition, and has never attempted to cure, nor has it been prevented from doing so. Long before Apple Glen filed suit, ESI had affirmatively decided to put its obligations under the lease on an indefinite hold. ESI already knew of the deficiencies and clearly had no intention of remedying them.  The notices provided to ESI

fell on deaf ears and any further notices would have been futile. See Garcia v. Wachovia Corp., 699 F.3d 1273, 1278 (11th Cir. 2012) ("[t]his circuit does not require a litigant to engage in futile gestures").

**2.      Replacement and Maintenance of Items such as Landscaping. (Fourth Affirmative Defense)**

For its fourth affirmative defense, ESI asserts that "Apple Glen seeks to require ESI to replace or maintain equipment that was installed by ESI and items that are not the subject of any potential maintenance requirement such as landscaping." (Doc. # 4-4 at 23).  ESI came forward with no evidence to prove that Apple Glen intended to "require ESI to replace or maintain equipment that was installed by ESI."

Further, "Leased Premises," as defined in the lease, includes "(i) the lot or parcel of land [], together with easements, rights and appurtenances thereunto belonging or appertaining (the "Land"); (ii) the building and related improvements and any other structures or other improvements now existing or hereafter constructed or reconstructed on the Land (collectively, the "Improvements")." (PX-4 at ¶ 2).   The Court finds that landscaping on the "Land" is among the "Improvements."  The lease requires ESI to "at all times . . . put, keep and maintain the Leased Premises (which includes the Improvements) . . . in a first class condition and order of repair, except for ordinary wear and tear . . . ."  (PX-4 at ¶ 12(a)).  Accordingly, the Court finds for Apple Glen on ESI's fourth affirmative defense.

**3.      Failure to Raise Deficiencies Earlier (Fifth and Seventh Affirmative Defenses)**

ESI asserts that Apple Glen's claim is barred because Apple Glen purportedly inspected the leased premises while ESI controlled the property, but did not raise deficiencies sooner.  As a result, ESI argues, it was "deprived of the opportunity to make the alleged necessary repairs." (Doc. # 4-4 at 24).

To the extent that ESI's affirmative defenses are based upon waiver or estoppel, those defenses fail because of the express terms of the lease.  Apple Glen had a right to inspect but no duty to inspect the leased premises while ESI controlled the property.  (PX-4 at ¶ 28).  And, the lease expressly provides, "No delay or failure by Landlord to enforce its rights under this Lease shall be construed as a waiver, modification or relinquishment thereof."  (PX-4 at ¶ 21(a)).  Florida courts consistently enforce non-waiver provisions. See Nat'l Home Communities, L.L.C., 874 So. 2d at 634 (finding that anti-waiver provision in lease precluded tenant's waiver argument) (collecting cases); Bradley, 943 So. 2d at 222 (enforcing provision in real estate purchase contract precluding waiver of any contractual term absent written modification of the contract); Rybovich Boat Works, Inc., 587 So. 2d at 522 (waiver defense was "defeated as a matter of law by the [anti-waiver] provisions of the contract itself").

ESI's defenses also fail for lack of evidence.  Specifically, ESI failed to adduce any evidence that Apple Glen actually inspected the leased premises and learned of any specific deficiencies but failed to report those deficiencies to ESI.  Further, ESI came forward with no evidence that proves it was deprived of the opportunity to make necessary repairs or replacements to the leased premises or equipment after Apple Glen provided ESI notice of the deficiencies.  Accordingly, the Court finds for Apple Glen on ESI's fifth and seventh affirmative defenses.

**4.     Splitting Causes of Action (Sixth Affirmative Defense)**

In its Sixth Affirmative Defense, ESI asserts: "Apple Glen's claims are barred to the extent Apple Glen has improperly split causes of actions.  Apple Glen has previously sued ESI for failing to properly maintain the leased premises but failed to raise the present issues." (Doc. # 4-4 at 24).  Specifically, ESI and Apple Glen litigated a prior state-court dispute primarily as to whether ESI was a hold-over tenant from 2010, to 2014.  Apple Glen subsequently added a claim in that dispute

when ESI commenced the replacement of the roof, but refused to pay for the installation of a 20-year roof. (DX-115; Doc. # 78 at 88-89). Apple Glen was forced to pay the difference to upgrade to a 20-year roof, and sued ESI to recover that amount.  (Doc. # 78 at 88).  Apple Glen has not asserted a claim in this action to recover amounts expended for previous roof replacement.

To the extent ESI's affirmative defense is aimed at Apple Glen's claim in the present case for failure to maintain the roof, it is not necessary to evaluate the splitting causes of action defense because the Court found in favor of ESI with respect to whether ESI breached the lease as to the roof.  The Court however, will generally evaluate ESI's "splitting causes of action" defense to the extent ESI seeks to preclude an award of damages based on other breaches of the lease.

After due consideration, the Court finds that the defense fails for several reasons.  First, the doctrine of "splitting causes of action" is not a separate ground for relief but is, rather, an aspect of res judicata. Desisto v. City of Delray Beach, No. 14–14380, 2015 WL 4138767, at *2 (11th Cir. July 10, 2015) (noting that "[appellant] is incorrect in characterizing the magistrate judge's discussion of the doctrine against splitting causes as an alternative ground for dismissal."); Tyson v. Viacom, Inc., 890 So. 2d 1205, 1212 (Fla. 4th DCA 2005) ("[T]he rule against splitting causes of action is only an aspect of res judicata.").  "Because the rule against splitting causes of action is only an aspect of res judicata . . . if res judicata is not a bar to the bringing of a claim, impermissible splitting of causes of action is not either." Tyson, 890 So. 2d at 1212.

ESI has not raised res judicata as an affirmative defense. See, e.g., Tampa Bay Storm, Inc. v. Arena Football League, Inc., No. 96–29–cv–T–17C, 1998 WL 182418, at *2 (M.D. Fla. Mar. 19, 1998). But even if it had, that defense would fail because there is no identity in the cause of action asserted in the prior state-court dispute and the cause of action asserted in this case.  See Lozman v. City of Riviera Beach, 713 F.3d 1066, 1074 (11th Cir. 2013) ("Under Florida law, res

judicata applies where there is . . . (2) identity of the cause of action . . . ."). There is identity between two causes of action only where the "facts or evidence necessary to maintain the suit are the same in both actions." Albrecht v. State, 444 So. 2d 8, 12 (Fla. 1984), superseded by statute on other grounds; Bowen v. Fla. Dep't of Envtl. Regulation, 448 So. 2d 566 (Fla. 2d DCA 1984); U.S. Project Mgmt., Inc. v. Parc Royale E. Dev., Inc., 861 So. 2d 74, 76 (Fla. 4th DCA 2003) (same); Gold v. Bankier, 840 So. 2d 395, 397 (Fla. 4th DCA 2003)("Identity of the causes of action is established where the facts which are required to maintain both actions are identical."); Muhammad v. Sec'y, Fla. Dep't of Corr., 739 F. 3d 683, 688 (11th Cir. 2014) ("Florida law defines identical causes of action as causes sharing similarity of facts essential to both actions.").

Apple Glen sued ESI in the prior state-court dispute to recover for ESI's failure to put, keep, and maintain the roof in a first class condition. The facts and evidence necessary to maintain that claim concern the difference between a 10-year roof repair and a 20-year roof repair. In contrast, Apple Glen's claim in this case, and the facts and evidence necessary to maintain such claim, focuses on twenty-six specific physical deficiencies, none concerning the difference between a 10 year roof and a 20 year roof. As there is no identity between Apple Glen's cause of action asserted in the prior state-court dispute and Apple Glen's claim asserted here, neither res judicata nor the doctrine of "splitting causes of action" bars Apple Glen's claim.

Further, ESI's obligation to put, keep, and maintain the leased premises and equipment in a first class condition and order of repair was continuing in nature. ESI's prior breach of that obligation by failing to put, keep, and maintain the roof in a first class condition does not prospectively insulate ESI from subsequent claims for different breaches of that same obligation. Where a prior lawsuit "is based upon a long-term continuing contract," such as the lease, "[s]uch a contract can be breached intermittently during its term. Litigation or settlement will not

automatically bar a later suit for a second, identical breach." <u>Klein v. John Hancock Mut. Life Ins.</u> <u>Co.</u>, 683 F.2d 358 (11th Cir. 1982) (applying Florida law and holding that settlement of a prior action claiming that the plaintiff insured was disabled, triggering a waiver of premiums clause, did not preclude a second action claiming disability and triggering of the clause at a later time).

The physical deficiencies that Apple Glen has identified are subsequent breaches of ESI's obligation to put, keep, and maintain the leased premises and equipment in a first class condition, separate and apart from ESI's prior failure to properly repair the roof.  Put differently, the physical deficiencies Apple Glen has litigated in this case are separate acts, which are distinct from ESI's previous alleged failure to properly repair the roof.  <u>See</u> <u>Scovell v. Delco Oil Co.</u>, 798 So. 2d 844, 846 (Fla. 5th DCA 2001) (holding that the rule of res judicata or splitting causes of action did not bar a second lawsuit for breach of a lease when first breach of the lease for the failure to install new petroleum lines was a separate wrongful act resulting in different damages from the second breach of the lease for failure to remove petroleum equipment).

Finally, ESI failed to come forward with any evidence that proves that Apple Glen's claims as to the physical deficiencies had accrued as of the date that Apple Glen filed its prior state-court complaint to recover for the roof replacement.  The rule against splitting causes of action "does not require the joinder of a cause of action that is not 'available' because it has not accrued with a cause of action that has accrued." <u>Larson & Larson, P.A. v. TSE Indus., Inc.</u>, 22 So. 3d 36, 47 at n.7 (Fla. 2009). "Under the rule against splitting a cause of action, a new claim for damages is not barred if the underlying cause of action had not accrued at the time of filing the previous lawsuit." <u>Gilbert v. Fla. Power & Light Co.</u>, 981 So. 2d 609, 614 (Fla. 4th DCA 2008) (holding that claims against power company for damages caused by noise from transformer and its subsequent removal had not accrued at the time plaintiffs filed first action against power company to move

transformer); see also Olesh v. Greenberg, 138 So.3d 561, 562 (Fla. 5th DCA 2014) (holding that "[t]he claims raised in the instant complaint" were not barred because they "had not yet accrued when the [first] action was filed").

ESI has not shown that Apple Glen's claims accrued when Apple Glen filed its first lawsuit. Principles of res judicata only extend to claims in existence at the time of filing the original complaint and any additional claims actually asserted by supplemental pleading. See In re Piper Aircraft Corp., 244 F.3d 1289, 1298 (11th Cir. 2001); Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1356–59 (11th Cir. 1998); Manning v. City of Auburn, 953 F.2d 1355, 1359–60 (11th Cir. 1992).

To the extent that ESI urges the Court to consider what claims could have been raised, it declines to do so.  "[A] claim is not barred by res judicata simply because it could have been raised in the first action if it does not otherwise meet the four identities required by the doctrine." Grasso v. Grasso, 2014 WL 6686329, at *3 (M.D. Fla. 2014).

Here, the application of the rule against splitting causes of action would serve no purpose but to convenience the alleged wrongdoer. The rule "should not be declared rigid, inflexible and inexorable when such declaration would in many, many instances, for the sake only of convenience to a putative wrongdoer, defeat the ends of justice." Rosenthal v. Scott, 150 So. 2d 433, 439 (Fla. 1961). "Any doubt as to whether these litigants have had their day in court should be resolved in favor of full consideration of the substantive issues of the litigation." Neidhart v. Pioneer Fed. Savs. & Loan Ass'n, 498 So. 2d 594, 596 (Fla. 2d DCA 1986). Based on "the Eleventh Circuit's strong policy of determining cases on their merits," the doctrine of res judicata and splitting causes of action does not bar the present action.  Alley v. Les Chateaux v. Condo  Ass'n, 2012 WL

254062, at *3 (M.D. Fla. 2012).   Accordingly, the Court finds for Apple Glen on ESI's sixth affirmative defense.

### 5.   Reasonable Wear and Tear (Ninth Affirmative Defense)

For its ninth affirmative defense, ESI asserts that the "alleged deficient condition of the premises constitutes reasonable wear and tear as permitted under the Lease."   The Court has already addressed and resolved the reasonable wear and tear concept in the context of each of the twenty-six physical deficiencies that Apple Glen identified in this litigation.   For the reasons articulated above, the Court finds for Apple Glen on ESI's ninth affirmative defense.[1]

### D.   Damages and Prejudgment Interest

Apple Glen is entitled to $4,654,688.65.   The Court finds that for the purposes of calculating prejudgment interest, the date of Apple Glen's loss was March 31, 2014, the date that ESI vacated the Leased Premises.   Apple Glen is entitled to prejudgment interest from April 1, 2014, through the date on which final judgment is entered.   (PX-4 at 24, ¶ 20(b)(iv)).

## III.   CONCLUSION

For the reasons stated above, the Court finds that Apple Glen Investors, L.P., is entitled to Final Judgment in its favor and against the Defendant, Express Scripts, Inc.   Apple Glen is the prevailing party and entitled to attorneys' fees and costs incurred to enforce the terms of the lease and under applicable law. (PX-4 at ¶ 12(c) and ¶ 21(d)); See Munao, Munao, Munao, & Munao v. Homeowners Ass'n of La Buona Vita Mobile Home Park, Inc., 740 So. 2d 73 (Fla. 4th DCA 1999).

The parties stipulated that any attorneys' fees, costs, and prejudgment interest issues (except the finding of a date of loss for purposes of prejudgment interest) shall be dealt with

---

[1]  It is not necessary to discuss ESI's eighth affirmative defense because that defense concerns Apple Glen's assertion of damages for the roof and skylights, and the Court found in favor of ESI on the roof and skylight issues.

separately post judgment. (Doc. # 77 at 17-18).  To the extent Apple Glen, as the prevailing party, seeks attorneys' fees, costs, and prejudgment interest, it has thirty days from the date of this Order to file an appropriate motion requesting such relief.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)     The Clerk is directed to enter judgment in favor of Apple Glen Investors, LP, in a sum of **$4,654,688.65,** plus prejudgment interest accruing from April 1, 2014, and thereafter **CLOSE** this case.

(2)     Apple Glen has thirty days from the date of this Order to file any motions for attorneys' fees, costs, and prejudgment interest.  Case closure by the Clerk will not prevent the Court from ruling on any timely filed requests for attorneys' fees, costs, and prejudgment interest sought herein.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida this <u>10th</u> day of March, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE